**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Richard SEADER and Thomas Ray Sandell, Defendants-Appellants.**

**No. 29679.**

United States Court of Appeals, Fifth Circuit.

March 15, 1971.

Rehearing Denied April 22, 1971.

Sheldon Dubler, Miami Beach, Fla., for Seader.

Robert P. Foley, John S. Call, Jr., West Palm Beach, Fla., for Sandell.

Robert W. Rust, U. S. Atty., Lloyd G. Bates, Jr., Asst. U. S. Atty., Miami, Fla., for the United States.

Before GEWIN, COLEMAN, and AINSWORTH, Circuit Judges.

COLEMAN, Circuit Judge.

The grand jury for the Southern District of Florida indicted Thomas Ray Sandell and Richard Seader for conspiring to transport falsely made and forged securities, to-wit, American Express Company money orders stolen in a burglary of a 7–11 store located in Homestead, Florida, in violation of 18 U.S.C. § 371.

In Count 2 Sandell was indicted for the transportation in interstate commerce of a forged American Express Company money order, No. AT 737–008–664, 18 U.S.C. § 2314.[1]

In Court 3 Seader was similarily indicted for the transportation in interstate commerce of another Express Company money order, knowing the same to have been falsely made and forged, 18 U.S.C. § 2314.

---

1. 18 U.S.C. § 2314. Transportation of stolen goods, securities, moneys, fraudulent State tax stamps, or articles used in counterfeiting

Whoever transports in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud; or

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transports or causes to be transported, or induces any person to travel in, or to be transported in interstate commerce in the execution or concealment of a scheme or artifice to defraud that person of money or property having a value of $5,000 or more; or

Whoever, with unlawful or fraudulent intent, transports in interstate or foreign commerce any falsely made, forged, altered, or counterfeited securities or tax stamps, knowing the same to have been falsely made, forged, altered, or counterfeited; or

Whoever, with unlawful or fraudulent intent, transports in interstate or foreign commerce any falsely made, forged, altered, or counterfeited securities or tax

Whoever, with unlawful or fraudulent intent, transports in interstate or foreign commerce, any tool, implement, or thing used or fitted to be used in falsely making, forging, altering, or counterfeiting any security or tax stamps, or any part thereof—

Shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

This section shall not apply to any falsely made, forged, altered, counterfeited or spurious representation of an obligation, bond, certificate, security, treasury note, bill, promise to pay or bank note issued by any foreign government or by a bank or corporation of any foreign country.

Sandra Jean Neal and Joseph Gregory were also indicted. They entered pleas of guilty. Gregory was called as a witness for the Government. Seader called Sandra Neal as a witness.

After a four day trial, the jury found Sandell and Seader guilty as charged. We affirm.

Sandell seeks reversal on no less than eight grounds. It is said that the evidence was insufficient to sustain the convictions, that Sandell's motions for directed acquittal should have been granted, that the trial court unduly restricted cross examination on behalf of Sandell, that testimony concerning certain conversations with one Joseph Gregory was erroneously admitted, that there was error in the instructions, and that Sandell should have been granted a new trial. We have read the trial transcript and are left with the decided opinion that these contentions are not of sufficient merit to warrant discussion.

Sandell's remaining contentions deal with certain identification procedures, the use of photographs and an appearance at a booking desk, which he says were so impermissibly suggestive, or otherwise illegal, as to void his convictions.

Seader says that the evidence was insufficient to support his conviction, that the above mentioned testimony of Gregory should have been excluded, that the attitude of the trial judge denied him a fair trial, and that there was error in the denial of certain jury instructions requested on his behalf.

The outcome of this case as to both defendants really depended on whether the jury chose to believe the witnesses for the Government or those for the defense. This was a difficult case to try, yet we detect nothing that would cause us to suspect that the trial judge failed to handle it in a commendably fair and impartial manner.

Seader's contentions do not merit a reversal and his conviction is affirmed.

Sandell's arguments as to his identification by Mrs. Carroll Helen Chesser and Donald Hill, to be determined within the context of all the evidence, require more extended discussion.

Minda Mondy Shiland was the first witness for the prosecution. She was personally acquainted with both Seader and Sandell. She met Seader while she was employed in Homestead, Florida. She accompanied Seader and Joe Gregory to Sandell's home in Palm Beach on a Sunday morning in October, 1968. Seader and Gregory had with them about twenty of the stolen Express money orders. After the Sunday conversations at Sandell's she spent the night in a motel in the Palm Beach area while the other two returned to Homestead to retrieve the money order machine. They returned early Monday morning, after which all three again went to Sandell's house, with the money order machine in the trunk of the automobile. After a brief visit in the Sandell house, Shiland saw Seader take a dirty clothes basket out to his automobile, put the money order machine in that container, bring it back in the house, and deliver it to Sandell. They were also at Sandell's on at least two other days that week. It was her testimony, *and that of Joe Gregory*, that during these visits Seader and Gregory, in return for the money order machine and forms, obtained false identification papers from Sandell, that is, Florida driver's licenses and a Woolco credit card typed out by Sandell in the names of individuals taken from a telephone book. These false driver's licenses were used as identification upon which to cash many of the stolen money orders.

The second witness for the Government was Elmo Frederick Midyette, Jr. Midyette was personally acquainted with both Seader and Joseph Gregory, as well as with Miss Shiland. He also knew David Bishop, one time assistant manager of the 7–11 store in Homestead. Midyette personally participated in and described the entry into the 7–11 store on October 5, 1968, and the taking of the money order machine and the money order forms. The other participants were Joe Gregory and assistant manager

Bishop. Seader did not enter the store but waited about a block away and thereafter went with the others to a canal bank where they "printed up" the money orders. They had taken nine books, consisting of 180 forms. Seader was present when they discarded the money order machine and some of the forms on the canal bank. Midyette, within a few days, was arrested by the Prince George County, Virginia, police department and held because he had some of the money order forms in his possession.

The next witness was Mrs. Carroll Helen Chesser. Mrs. Chesser was the head teller at the First Federal Savings and Loan Association of West Palm Beach. She testified that on October 8, 1968, Sandell presented and she cashed the stolen money order described in the indictment. She identified this instrument by her teller's stamp and her handwriting. At the cashing, Sandell wore a moustache, had dark hair, and a receding hairline. He told her that he was a musician with a band in Miami.

She did not see Sandell again until the day prior to her testimony, when she ran into him in a corridor of the courthouse. Sandell was on bail at the time and not in the company of officers. No one pointed him out to her but she recognized him.

Mrs. Chesser was about to make an in-court identification of Sandell when his counsel objected and the jury was retired. Mrs. Chesser then testified that about November 8, 1968, an F.B.I. agent came to see her about the missing money orders. He had several photographs of white men, some young and some middle-aged. There were four or five of them. She had previously stated to the detectives that the man for whom she cashed the money order had a moustache, dark hair, and a receding hairline. About a week before the trial, for the second time, she was shown the same pictures by the F.B.I. On both occasions she identified Sandell's picture as being that

of the man who had cashed the money order.

Joe Gregory was brought in to see if he, not Sandell, was really the man who cashed the money order, as they resembled each other, at least as to age, color of the hair, and moustache. Mrs. Chesser insisted that it was Sandell who cashed the money order, that there was no question in her mind of the correctness of her identification.

While the jury remained out of the courtroom, the defense called Robert E. Wonderle, a state officer, who testified that on the previous day, while the witnesses were excluded from the courtroom and were "waiting in the hallway all day long", Mrs. Chesser looked through the glass in the door to the courtroom and asked, "Is he in the courtroom" (referring to Sandell)? The officer replied, "He is sitting at that table", but Sandell's back was turned and "she couldn't identify him."

Mrs. Chesser's testimony was also vigorously attacked on the ground that soon after the discovery of the bogus character of the money order, Mr. Wonderle, the state officer, had shown her a pack of five or six pictures, which included two pictures of Sandell. One of these pictures was a mug shot, recently taken by the Sheriff's office, apparently when Sandell was arrested on October 21 for some other offense. Mrs. Chesser had forgotten about being shown these pictures and could not recall it on the witness stand. Sandell says that Mrs. Chesser's inability to recall the first photographic display proves that the mug shot caused his identification.

Sandell's attorney objected to the testimony of Mrs. Chesser under the *Wade* [2] case in that Sandell had no lawyer present when the photographs were exhibited to her or when she looked through the window into the courtroom and that the procedures thus invoked were impermissibly suggestive. The motion to suppress Mrs. Chesser's testimony was over-

'2. United States v. Wade, 1966, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149.

ruled and Mrs. Chesser, in the presence of the jury, positively identified Sandell from the witness stand as the individual who cashed the stolen money order. She testified that Sandell used for identification a driver's license bearing the name of "Clifton J. Carlin". Joseph Gregory was again brought to the courtroom, before the jury, and Mrs. Chesser said she did not recognize him.

Later on, Joseph Gregory testified that the "Clifton J. Carlin" driver's license was given him by Sandell and that he used it to cash various money orders, at least one of them at a point near in time and place to the episode described by Mrs. Chesser. Also, Gregory testified that he was under the influence of narcotics most of the time, including LSD on one occasion. He said he had been off narcotics for seven months at the time of the trial.

Gregory also testified that he went to Sandell's house in the early part of October, 1968, with Richard Seader, where he met Ray Sandell, Sandra Jean Neal, and another person whom he did not know. He saw Sandell type out the false driver's licenses and give them to Gregory and to Seader, as well as a Woolco credit card which was given to Seader.

Sandra Jean Neal, the indicted co-defendant who pleaded guilty, testified that she was at Sandell's home when Minda Mondy, Richard Seader, and Joe Gregory came there on Sunday morning, October 6, 1968, that Seader talked with Sandell in one of the backrooms, but she heard none of the conversation. They all came back to the house on Monday, but Sandell was not there. She left with them and afterwards went to Miami with Joe Gregory, who, on the return trip, gave her some money orders to cash, and asked her about obtaining some kind of ID card. She had been living with Sandell for about two months at the time of these incidents.

Miss Neal identified two money orders which she had cashed, one of them at the Merlin-Rent-a-Car (Mr. Donald Hill). She testified that Royce Peake, an employee of Sandell's drove her to the Rent-a-Car office, that she had never seen Sandell with any American Express money orders or with a money order machine.

John Thomas Munn was a resident of the Sandell house. He testified that he was at Sandell's on Sunday, October 6, 1968, when Richard Seader, Joseph Gregory, and Minda Mondy paid a visit at about 10 o'clock in the morning. Sandra Jean Neal was also present. He heard no money orders mentioned. He saw the same individuals at Sandell's on Tuesday afternoon but said that Sandell was not there. Later, Mondy, Gregory, and Seader came back with a fourth person. Sandell had arrived home by that time and ordered them to leave. Munn never saw any money orders or money order machine.

Munn was at the house on October 21, 1968, when detectives from the Palm Beach Sheriff's Office, armed with a search warrant, searched the house. It may be inferred from the record, although not specifically stated, that the searchers found a quantity of marijuana. No money order machine or money orders were found. Munn, Sandra Neal, and Sandell were arrested, taken to the county jail, and booked about 5:30 p.m.

This booking generated the second point in this appeal.

The automobile rented by Sandra Neal was not returned the next day as per contract. Donald Hill reported to the police. When Sandra Neal was arrested the police called Hill to come to the station to see if he could identify the arrested woman as the one who had rented the car. She was wearing a blond wig so Hill could not identify her until he was shown a wallet, containing some pictures, taken from Miss Neal's purse, which she had shown him when she rented the car. This, despite the wig, caused him to identify Miss Neal.

On his direct examination, Hill testified that after he found out that he had rented the car to a person using the name of a person who knew nothing of the transaction the police showed him

pictures of people who might have been the *male driver* of the automobile which brought Miss Neal to this place of business but he could make no positive identification, although one of them closely resembled the man who later turned out to be Sandell.

At the trial, Hill identified Sandell at the counsel table as the driver of the car.

We now excerpt pertinent portions of Hill's testimony.

"A. I was taken to the Palm Beach County jail by West Palm Beach Det. Wonderle to identify Miss Martha Austin, as I knew her. I saw her at a distance through the bars before I was brought into the room, and it was very·hard to even identify her at that time because of her appearance—when she came to rent the car it was entirely different. As far as the color of the hair, clothing, and the feminine build was even a little bit different than when she came and rented the car from me.

"Q. Well, did you identify him [Sandell] subsequently?

"A. Yes.

"Q. At a lineup?

"A. No, sir, he was standing right in with other prisoners that were in the—at the booking desk.

"Q. Were there any other people other than Mr. Sandell there?

"A. Oh, there were a number of people standing in the lobby.

"Q. How many?

"A. Four or five men, one other woman—two women besides Martha Austin.

"Q. Was Mr. Sandell pointed out to you?

"A. No, sir.

"Q. Was any suggestion made by anybody to you to select Mr. Sandell?

"A. No, sir, he just asked me if I recognized anybody in that group.

"Q. Who asked you?

"A. The detective.

"Q. Mr. who?

"A. Mr. Wonderle.

"Q. Where did you go when the car was brought there?

"A. The young lady walked out to the car and spoke to the gentleman in the car. I walked to the front door and then to the car with her.

"Q. You didn't go over to the car where the man was?

"A. Not any further than right here (indicating).

"Q. How many feet from the car were you?

"A. 10—10 to 12 feet.

"Q. From the passenger side of the car?

"A. That is correct.

"Q. Sir, didn't you tell Sgt. Wonderle that you could not identify him and, in fact, you couldn't even identify the girl at that time?

"A. Oh, yes, I could.

"Q. That's your sworn testimony here, that you walked into that jail and identified both of them, just like that?

"A. There were some other circumstances that made me identify them, yes. The young lady had a picture of her son in her wallet that she showed to me at the time she rented the car. I commented on it, that she had this picture in this wallet.

"Q. And when she brought her wallet—you said that this is the girl, because of the wallet—before you saw this wallet you identified her?

"A. I saw it before that. I identified her by the fingernails.

"Q. What type of fingernails.

"A. Very long fingernails and two chipped teeth in the front.

"Q. Mr. Hill, when you went to the jail, how many white males did you see there?

"A. Three, four, five, I don't remember exactly. There were a lot of people standing there, inmates as well as officers.

"Q. There was only one person with handcuffs on, wasn't there?

"A. I didn't see anybody in handcuffs.

"Q. You didn't see Thomas Ray Sandell in handcuffs?

"A. No, I was not that close to him to see handcuffs.

"Q. How far away were you when you made that identification?

"A. About as far as you and I are here. His back was to the wall at the time.

"Q. Was this in front of the booking desk in the Palm Beach County Jail?

"A. Yes, sir.

"Q. Where were you at that time?

"A. At the entrance.

"Q. Looking through two doors, two barred doors—are there, aren't they?

"A. No, I came through the Detective Division, at the westerly—

"Q. So you looked through a barred door there?

"A. It's just plain bars.

"Q. So it is a door containing bars?

"A. No, it's just one big gate-like. There wasn't glass in it.

"Q. A big gate containing bars?

"A. Yes, sir.

"Q. And you looked through that?

"A. Yes, sir.

"Q. Now, when you looked through to the booking desk—do you recall that there are two barred gates?

"A. Yes, sir.

"Q. Did you look through two barred gates at Mr. Sandell?

"A. I was inside the other one, inside the first gate.

"Q. You were inside the first gate—looking through the bars of the second gate?

"A. Yes.

"Q. Did you make a statement at any time, sir, that you couldn't identify either of the two people that were in front of the booking desk?

"A. At the time I believe I told the sergeant that I wasn't quite sure because of the change in the young lady and I said I would have to see her up closer.

"Q. Then when she brought her wallet out and you saw the picture of the boy—

"A. That was much later.

"Q. How much later?

"A. 45 minutes to an hour later.

"Q. Where did you see her 45 minutes to an hour later?

"A. It was in a little room with a table.

"Q. You were brought into a smaller room with Miss Austin?

"A. Yes, sir.

"Q. And then you identified the girl that you had made this contract with and walked outside with and walked over and showed her how to work the car—

"A. "Yes.

"Q. Then you identified her?

"A. Yes.

"Q. When did you decide that it was Sandell that drove her there?

"A. I didn't know the gentleman's name. I just identified him as being the gentleman.

"Q. Did you go into another room after looking through these bars —with Sandell—like you did with the girl?

"A. No, sir.

"Q. Was there a conducted lineup that the police were doing for you?

"A. No, sir, they looked like they were being booked.

"Q. They were all being booked?

"A. That's what appeared to me, yes.

"Q. There were detectives there and there were prisoners there?

"A. Yes, sir.

"Q. Now, this is my point—wasn't Sandell and the Austin girl being booked in at that time and you were brought there and you were asked if you recognized these people and you said, 'I don't recognize these people,' and you said that you later recognized her; isn't that what happened?

"A. No, sir, it's not.

"Q. Mr. Hill, showing you this card case which has been marked as Exhibit No. 22 for identification for the Government—can you identify that?

"A. Yes, sir.

"Q. What is it, please?

"A. This is the wallet that Martha Austin had her driver's license in and when she handed it to me it had a picture, and she told me that this was her son."

Thomas Ray Sandell, age thirty-one, took the stand in his own defense. He had never been convicted of crime, was an accountant, a part time policeman, and an elected councilman in Royal Palm Beach. He also was a minister. He admitted seeing Seader, Gregory, and Mondy on Sunday, October 6, 1968, at his home, but denied any criminal conduct whatsoever. He denied going to the bank or cashing the money order. He denied driving Sandra Neal to the Rent-a-Car agency.

He saw Hill at the jail on October 21, 1968. Hill was on the other side of the bars with Munn and Wonderle, police officers. For ten or fifteen minutes Hill kept shaking his head that he could not identify either Sandell or Neal.

When Wonderle opened Neal's purse and took out the wallet then Hill said that he remembered the picture of the little boy and that there "was never any question that I [Sandell] had been there at the time". Sandell said that F.B.I. agent Philbin had told him that Hill could not identify him at the jail [Philbin denied making this statement].

On cross examination Sandell testified that he had been divorced from his wife in Palm Beach on December 6, 1965, had remarried after he was charged in this case, but had lived for nine months with Sandra Jane Neal without being married to her. He owned a 1966 blue corvair convertible. He claimed Seader came to his house to discuss marital difficulties—that he had performed the ceremony when Seader was married.

John Thomas Munn, in general, agreed with Sandell's version of what happened at the jail when he, Sandell, and Neal were booked. Specifically, he said that he heard Hill say at least twice that he could not identify Sandell until the wallet was produced.

We consider first the in-court identification supplied by Mrs. Chesser.

█ We are of the opinion that this identification was well within the guidelines laid down by Simmons v. United States, 1968, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247. In that case Simmons was convicted of the armed robbery of a federally insured savings and loan association. He asserted that his pretrial identification by means of photographs was in the circumstances so unnecessarily suggestive and conducive to misidentification as to deny him due process of law, or at least to require reversal of his conviction in the exercise of supervisory power over the lower federal courts. The Supreme Court disagreed. The photographs were shown the next day after the robbery to the bank employees separately. All of them identified Simmons as being one of the robbers. The Court held that these cases must be evaluated in the light of the totality of the surrounding circum-

stances, that "convictions based on eye-witness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification", and that there was little chance that the use of the photographs led to the misidentification of Simmons. It is to be noted that six photographs had been displayed to the witnesses and there was no evidence that the officers in any way suggested who was under suspicion. Also, the witnesses had subsequently viewed the photographs, as in the case now before us, and had adhered to their original identifications. On cross examination none of the witnesses displayed any doubt as to their respective identifications. Although the identification procedure used may have in some respects "fallen short of the ideal", the use of the photographs had not denied Simmons due process.

See, also, the decisions in this Circuit: United States v. Sutherland, 1970, 428 F.2d 1152; United States v. Ervin, 1971, 436 F.2d 1331, and United States v. Elliott, 1971, 437 F.2d 1253.

■ Sandell complains that in the trial the presiding judge did not follow the procedure "suggested" in United States v. Sutherland, supra, 428 F.2d at 1155.

The answer to this is that Sandell was tried November 10–13, 1969. This "suggestion" was published April 29, 1970. Moreover, we do not find from the record that Sandell requested or was denied such a procedure. The District Court did hear and deny a motion to suppress the Chesser identification as being violative of Simmons. Thus, the trial court by another method, complied "in advance" with the rationale of the Sutherland suggestion. Sandell's right to a fair trial was in no way prejudiced in this regard.

We attach no significance to the initial display of photographs, which con-tained the mug shot. Mrs. Chesser had already identified a photograph of Sandell before she saw that shot. Even more convincingly, Mrs. Chesser had so completely forgotten seeing those photographs that on the witness stand she could not be made to recall seeing them.

Nor is it of any prejudicial importance that through a glass in the courtroom Mrs. Chesser saw the back of a man whom she could not identify. The important consideration is that she recognized Sandell, on her own, when she encountered him in a corridor of the courthouse. See United States v. Pollack, 5 Cir., 1970, 427 F.2d 1168; Fitts v. United States, 5 Cir., 1969, 406 F.2d 518.

In sum, we are of the view that Sandell wholly fails to bring himself within the "impermissibly suggestive" rule of Simmons.

■ The last facet for disposition is whether his confrontation with Hill during the booking process at the county jail requires reversal under the teachings of United States v. Wade, 1966, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149. Wade, according to the opening statement of the opinion of the Court, presented the question of "whether courtroom identifications of an accused at trial are to be excluded from evidence because the accused was exhibited to the witnesses before trial at a post-indictment lineup conducted for identification purposes without notice to and in the absence of the accused's appointed counsel".

The Supreme Court held that in-court identification of defendants by witnesses to whom an accused is exhibited before trial *in the absence of counsel* must be excluded unless it can be established that such evidence had an independent origin or that the error in its admission was harmless.

It would be correct to say, we think, that in the case now before us there was no lineup within the usual meaning of the term. The police had no intention of exhibiting Sandell at all. They did

not have him there for identification. So far as this record shows he was not then suspected of participation in the money order case. According to the testimony of Sandell's witness, Munn, there had been a five hour search of Sandell's house and a quantity of marijuana had been found. Hill had been called to see if Neal might be the woman who had rented the car without returning it. This she came very near frustrating by wearing a wig. Hill testified that he saw no handcuffs on Sandell, that he was not close enough for that. Sandell and Munn said that Hill could not (at least at first) identify Sandell, although his purpose for being there was not to identify Sandell but to see if he could identify the woman as the one who had rented a car. Sandell had not been charged as to the money orders and, of course, had no attorney. Officer Wonderle testified that there had been no conversation about Sandell.

The better view of this situation is that Hill spontaneously recognized Sandell when he unexpectedly encountered him, even though the encounter was at a booking desk, where Hill had no prior idea that he would see him.

Should we be mistaken in this, however, we see no adequate basis for reversal. This identification dealt only with whether Sandell drove Miss Neal to the Rent-a-Car office—that and that alone. As to his personal association with Miss Neal the proof from other witnesses showed, and he admitted, that for at least three months he had lived with Miss Neal, in the same house where the other witnesses said the stolen money order machine and the stolen money orders had been delivered to him. One automobile trip, contrasted with three months of living together, can hardly be elevated to the status of prejudicial error.

The judgment of the District Court as to both Seader and Sandell is

Affirmed.