**UNITED STATES of America**

v.

**Gregory H. NEVERSON, Appellant.**

**No. 23732.**

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 15, 1970.

Decided April 26, 1972.

Mr. Charles S. Warren (appointed by this court), for appellant.

4. An appropriate instruction is set out in 1 Devitt & Blackmar, *supra* note 2, § 17.11.

Mr. Broughton M. Earnest, Asst. U. S. Atty., with whom Messrs. Thomas A. Flannery, U. S. Atty. at the time the brief was filed, John A. Terry and Edwin A. Williams, Asst. U. S. Attys., were on the brief, for appellee.

Before FAHY, Senior Circuit Judge, and McGOWAN and ROBINSON, Circuit Judges.

McGOWAN, Circuit Judge:

Appellant was convicted by a jury of two counts of armed robbery (22 D.C. Code § 2901), two counts of assault with a dangerous weapon (22 D.C. Code § 502), and one count of carrying a dangerous weapon (22 D.C.Code § 3204). On this appeal, he raises three issues, the only substantial one of which is a Fifth Amendment due process challenge to identification evidence against him.[1] For the reasons hereinafter appearing, we affirm.

I

At approximately 8:30 P.M. on April 24, 1968, a robber entered a liquor store in the southeast section of the District of Columbia, uncovered a sawed-off shotgun from underneath his coat, and placed the barrel of the weapon in the stomach of Fred D. Washington, a private guard who was standing at the store's entrance. Washington was ordered to turn around, and, as he obeyed the request, the assailant unbuttoned Washington's holster, removing a .38 calibre Colt revolver. The assailant then marched Washington to a cash register located at the rear of the store. Upon reaching that point, the robber handed the proprietor of the store, David Zylber, a paper bag and asked him to fill it with money. As Zylber began filling the bag with the $2,000.00 contained in the cash register, Herbert Wheeler, a store employee, returned from a stock room behind the counter. As he entered the main display area, he realized that a robbery was in progress. He stood at the counter watching the assailant while the paper bag was being filled. Once Zylber completed this act, he handed the bag to the robber, who then slowly backed out of the store, keeping his shotgun and the purloined pistol fixed on the three men at the counter. The robbery lasted no longer than two and one-half to three minutes.

Shortly after the robber had gone, Lieutenant Edward White of the Metropolitan Police Department responded to a radio run and arrived at the scene of the crime. At that time, he showed Zylber and Wheeler photographs of possible suspects, but neither was able to make an identification. Zylber professed inability to remember the robber's features, but Wheeler informed the officer that the robber was between 5'5" and 5'9", was a Negro of dark brown complexion, had a short goatee, and wore a black waist-length coat. Washington, who apparently did not view photographs at that time, gave Officer White a similar description, except that he described the assailant as being 5'7" and wearing a waist-length coat that was either brown or black. The next day Washington was called to the police station. He viewed between 200 and 800 photographs, without result. At this point, appellant's photograph had not been in any of the photographs shown to the eyewitnesses.

1. Appellant's other two points relate to the conduct of the trial. Although the court gave the standard instruction with respect to the Government's burden in proving identification, which instruction has been expressly approved by us, appellant claims error in that the court did not give an additional instruction requested by appellant. Considering the text of this latter instruction as submitted to the trial court, the point borders on the frivolous. Appellant further contends that the giving by the court of a standard *Allen* charge before the jury retired to deliberate necessitates reversal. Although we have, since this case was argued, directed certain changes in the text of that charge, United States v. Thomas, 146 U.S.App.D.C. 101, 449 F.2d 1177 (1971), that holding was prospective only. The charge as given in the circumstances of this record would not have occasioned reversal under our pre-*Thomas* decisions.

Some two weeks later, on May 6, 1968, the National Crime Information Center informed the Metropolitan Police Department that appellant and two other men had been arrested and charged with armed robbery in Prince William County, Virginia. It was also reported that at the scene of the arrest an officer had recovered a .38 calibre Colt revolver which bore the same serial number as the pistol reported as having been taken from Washington at the liquor store. Upon receipt of this information, Lieutenant White sent a police photographer to Virginia in order that appellant, his two Virginia co-defendants, and the revolver in question might be photographed with a color camera.

Lieutenant White then assembled an array of twelve color photographs consisting of individual photographs of ten Negro males between the ages of 20 and 30 years, including appellant and his two Virginia co-defendants. White also had one photograph of the recovered revolver; and one photograph of two revolvers which were very similar to the one taken from Washington.

On May 8, 1968, Lieutenant White visited Washington to show him these photographs. At the pretrial hearing, held to determine the admissibility of the identifications made at trial by the witnesses to the crime, Washington testified that Lieutenant White first showed him approximately eight or nine photographs from which he could make no identification. Then Officer White reached into his pocket and showed Washington three or four additional photos. Washington said that it was from this latter group that he identified appellant. Washington also testified that he had identified the photograph of the pistol recovered in Virginia as the gun taken from him.

Three days later, Lieutenant White visited Wheeler for the same purpose. At the pretrial hearing, Wheeler testified that when he was unable to make an identification from the first eight or nine photographs shown to him, Officer White handed him a second set of three to four photographs. Wheeler also made his identification of appellant from this second set of photographs, but apparently made no attempt to identify the revolver. Lieutenant White testified at the suppression hearing that, while he was uncertain about the manner in which the photographs were shown, his best recollection was that he displayed all of the pictures at one time to both Washington and Wheeler.[2]

On May 28, 1968, Lieutenant White and Mr. Wheeler drove to Manassas, Virginia, in order that Wheeler might view a lineup in which appellant and the two Virginia codefendants would participate. It appears that, prior to the lineup, Wheeler had seen appellant when he was being taken across the street from the county jail to the court house. This happened because White and Wheeler happened to arrive in front of the jail just as appellant was being taken to a preliminary hearing held in connection with the armed robbery charges against him in Virginia.[3] Following the prelim-

---

2. Appellant has raised no issue, either in the trial court or here, founded upon the Washington-Wheeler testimony as to the manner in which White exhibited the photographs. So long as there is no evidence that showing the photographs successively in a sequence of two groups had either a suggestive purpose or effect, we see no problem on this record, even if it be assumed that White's recollection was faulty.

3. Wheeler testified that, as he and Lieutenant White were about to park the car at Manassas, he saw appellant, two policemen, and two other men going from the county jail to the court house. Wheeler added that he did not tell Lieutenant White of his recognition of appellant, but that at the same time White explained to him that the lineup might be delayed because appellant was scheduled to appear at a preliminary hearing that morning.

Lieutenant White testified that, while he recalled observing a group of men walking from the county jail to the court house, he did not remember seeing appellant in that group. He did not recall ever telling Wheeler that appellant would

inary hearing, appellant was returned to the jail for the lineup. The room in which the lineup was held lacked the usual physical accoutrements which facilitate this type of identification. The room was small and crowded with onlookers. The five participants in the lineup were stationed in front of a row of vending machines.

The record does not suggest that there was any significant discrepancy in the stature, age, or dress of the participants. It is certain that Officer White, at some point prior to an identification of appellant, invited appellant to shift positions in the lineup, which he did. Wheeler, when he confronted the lineup, identified appellant, who is 6'2½" tall.

Further details concerning the lineup are not well established. Each witness at the suppression hearing who was present at that confrontation gave extended testimony as to the events surrounding it, but there were differences in their recollections.

Wheeler stated that, upon entering the jail, he was taken to a room where he sipped coffee while waiting for the lineup to be held. He said that he was in due course asked to wait in a nearby room while preparations for the lineup were made. He was then requested to reenter the original room, where he viewed the lineup and immediately identified appellant as the robber of the liquor store. Wheeler also stated that he had talked to no one prior to the lineup, and that he had never noticed any suggestive activity on the part of the officials conducting it, thereby indicating that he had not heard White's invitation to appellant to choose his own position in the lineup.

Lieutenant White also testified that Wheeler was in another room when the lineup was being arranged, and that,

while he (White) might have suggested to appellant that the latter would be free to move to a different position in the lineup, he did not offer such advice while Wheeler was in the room. Lieutenant White also asserted that Wheeler had talked to no one prior to the commencement of the lineup.

Appellant's father testified that he and appellant's mother had come to Manassas that day in order to attend the preliminary hearing. He further testified that he had been walking with his son from the jail to the court house when he noticed Wheeler and Lieutenant White approaching the general area in their car. Following the preliminary hearing, he and his wife again accompanied appellant back to the jail and into the room where the lineup was conducted. He said that, as his son entered the room, he overheard Lieutenant White mention appellant's name to Wheeler. The father then claimed that he approached Wheeler and asked him "if he [knew] Gregory Neverson," 'to which Wheeler responded in the negative. Appellant's father also claimed that he and Wheeler stood side-by-side in a hallway outside of the room in which the confrontation was eventually held, and they observed Lieutenant White arranging the five lineup participants. Appellant's father also testified that he believed Wheeler to have been intoxicated at the time.

James P. Davenport, a Manassas lawyer whose office was across the street from the jail, testified that he received a call from a local police official asking him to attend the lineup in order to represent appellant.[4] When he entered the room in the jail, he noted that it was crowded, and that the participants in the lineup were already assembled on the side of the room which contained vend-

---

be in the lineup, or that the lineup might be delayed due to appellant's preliminary hearing.

4. The Supreme Court said in *Wade* that the representation of a defendant at a lineup by substitute counsel was com-

patible with the Sixth Amendment. This court has upheld the practice. *See* United States v. Queen, 140 U.S.App.D.C. 262, 435 F.2d 66 (1970) ; United States v. Kirby, 138 U.S.App.D.C. 340, 427 F.2d 610 (1970).

ing machines. Wheeler, who was never identified to him as the eyewitness, was also present. Moreover, he stated that, as he began to question Lieutenant White about the wisdom of conducting the lineup under these conditions, Wheeler identified appellant. Finally, Davenport testified that Lieutenant White had indicated to appellant that he was free to shift positions in the lineup, which appellant did, but Davenport was uncertain whether the police officer called appellant by name. On cross-examination, Davenport conceded that, while he believed Wheeler was present when he initially entered the room, it was possible that the eyewitness was removed to a nearby room at the time Lieutenant White addressed appellant about his position in the lineup. On redirect, Davenport stated that he returned to his office approximately five to eight minutes after he had received the phone call requesting his assistance.

Appellant testified at the suppression hearing that Wheeler and White were both present during his preliminary hearing, which was conducted in the court house prior to the lineup. He also claimed that White and Wheeler observed him as he was being led handcuffed into the lineup, and that Wheeler was present at all times when the lineup was being arranged by White. In addition, appellant stated that Lieutenant White called him by name when suggesting that he might change positions.

The trial judge, at the conclusion of the suppression hearing, denied appellant's motion to suppress both the photographic and the lineup identifications without making any specific findings either orally or by memorandum.[5] At trial, the photographic identifications of both eyewitnesses, and Wheeler's lineup identification, were introduced into evi-

dence by the Government. Wheeler and Washington both made in-court identifications of appellant as well. The proprietor, Mr. Zylber, recounted the events of the robbery, but made no identification.

Another witness called by the Government was Samuel Josey, the owner of a detective agency. He testified that the serial number of the pistol issued to his employee, Washington, matched that of the pistol recovered at the time of appellant's arrest in Virginia. In order to avoid prejudicing appellant by revealing the fact that he had been arrested for a similar offense in Virginia, the following stipulation was read to the jury:

> On or about May 6, 1968, the defendant, Gregory Neverson and another man were arrested in a field in Prince William County, Virginia. The vicinity of their arrest was searched and two revolvers were found. One of the revolvers was a .38 calibre Colt blue steel revolver, serial No. 607853.

The defense put three witnesses on the stand. Charles Albritton, who had been convicted with appellant in the Virginia robbery, testified that the pistol in question belonged to him and not to appellant, and that he had bought it in a crap game only a few days prior to his arrest in Virginia. Appellant next took the stand and presented an alibi that he had spent the entire evening in question drinking at a bar in the company of a friend James Mitchell. Mitchell took the stand to support this testimony.

## II

■ Appellant contends that the color photographs shown to each of the eyewitnesses were "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Simmons v. United

---

5. As if to compound this unhelpful handling of the matter, neither did the trial judge take heed of our suggestion in Clemons v. United States, 133 U.S.App.D.C. 27, 34, 408 F.2d 1230, 1237 (1968) (en banc), cert. denied, 394 U.S. 964, 89 S.Ct. 1318, 22 L.Ed.2d 567 (1969), that it

would be "in the interest of expeditious judicial administration" for a ruling to be made as to whether there is an independant source for an in-court identification, even if the trial judge finds the challenged identification evidence to be valid.

States, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968). He supports this claim by two allegations, namely, that appellant was the only individual in the array who (1) had a goatee, and (2) was wearing a white undershirt. However, our examination of the photographs reveals that the first of these assertions is not wholly accurate, and that the second is not significant. Neither, in our view, denotes undue suggestivity.[6]

With regard to the goatee, it is quite clear that at least two of the other men depicted had facial hair which included that on the chin; and therefore no undue attention could have been drawn to appellant in this regard. Appellant argues that his goatee had special significance in Washington's case, because Washington emphasized the importance of that feature in making his identification. While it is true that the goatee did form a basis for Washington's identification, he also testified that he chose appellant's photograph because of "the way his face was built and everything," rather than just the goatee.

We also attach no crucial importance to the fact that appellant was the only subject in the photographs wearing a white undershirt. Most significantly in this regard, neither of the eyewitnesses described the robber to the police at the time of the crime as wearing such a shirt. Moreover, our examination of each of the photographs reveals that all of the men portrayed were dressed differently, and there were characteristics in each of the photographs which could have attracted as much attention as appellant's shirt, e. g., one of the men was the only one to wear a hat, another was the only one to wear a plaid shirt, while still another was the only one wearing a striped polo shirt.

Although we find no fatal suggestivity resulting from the specific factors complained of by appellant, we are mindful that Simmons, following the approach of Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), directs that the determination of the suggestivity of a photographic identification must be viewed in the light of the totality of the circumstances surrounding the identification. Keeping this requirement in mind, the record reflects that both eyewitnesses had an excellent opportunity to observe the assailant during the course of the robbery. There was uncontradicted testimony, both at the suppression hearing and at trial, that the lighting conditions in the liquor store at the time of the robbery were very good. Washington testified that, although his back was to the robber for the greater part of the robbery, he had about a minute to observe the robber as he slowly left the store, and at that time he was able to get a "good look at [him]." Wheeler also had an opportunity to observe the assailant from a distance of about thirty feet for all but the first few seconds of the robbery. It is also important to point out that the robber wore no mask nor did he disguise himself in any way. Finally, we note that all the men depicted in the photographs were Negro males, roughly in the same age group, and roughly of the same stature.

In *Simmons*, Mr. Justice Harlan, speaking for the Court, explicitly noted that "[t]he chance of misidentification is . . . heightened if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime." 390 U.S. at 383, 88 S.Ct. at 971. *See also* Palmer v. Peyton, 359 F.2d 199, 201 (4th Cir. 1966). This court has also suggested that such an indication would, in the absence of any countervailing consideration, tend to demonstrate that an identification procedure is suggestive. *See*

---

6. Although there were 12 photographs in the array, only 11 have been submitted to this court for examination. Apparently the twelfth photograph, which depicted one of the Negro males, has been included in the record of another case.

United States v. Terry, 137 U.S.App.D.C. 267, 273, 422 F.2d 704, 710 (1970).[7]

Appellant intimates in his brief, without amplification, that the use of the photographs of the pistols may have indicated to the eyewitnesses that one of the photographs being exhibited was the photograph of the robber. This aspect of *Simmons* does not, however, appear to have been pursued by appellant in the trial court, and the evidence is, accordingly, not developed with respect to it. The record does not, certainly, foreclose the possibility that the eyewitnesses were shown the pistol photographs *after* they had each identified appellant's photograph. Under all the circumstances including our own viewing of the photographic array and our finding it to be unexceptionable, we do not think it necessary to disturb this conviction by reason of the exhibition of the photographs of the guns.[8]

### III

Appellant's principal contention on this appeal in the area of identification has been directed to the photographic showings. That point, if soundly based, would have invalidated the identification evidence given by the two eyewitnesses who identified appellant at trial. Intermingled in his argument on this score in his brief is, however, a claim that Wheeler's identification, as distinct from Washington's, was tainted by the circumstances of the lineup in Virginia at which Wheeler identified appellant. This claim is couched in terms of due process alone, and not the Sixth Amendment's guarantees with respect to the assistance of counsel. It asserts that the identification evidence of Wheeler is tainted by (1) Wheeler's sight of appellant on the street in Manassas before the lineup and (2) Wheeler's presence at the lineup when White told Neverson that he could shift positions if he chose.

As to the first of these, Wheeler testified forthrightly that he did see a group of men crossing the street in Manassas just as he and White arrived from Washington and were parking their car; and that he instantly recognized appellant among them as the man who had held up the liquor store. This recognition appears to have been the spontaneous result of an accidental encounter, and not the product of the fact that White happened to tell Wheeler almost coincidentally that the lineup might be

---

7. In *Terry* this court endorsed a list of ten factors identified by Judge Gasch in United States v. O'Connor, 282 F.Supp. 963, 965–966 (D.D.C.1968), aff'd, 137 U.S.App.D.C. 76, 420 F.2d 644 (1969), as relevant to the issue of undue suggestiveness in a photographic identification. The fifth factor is stated in terms of the question of whether there "[w]ere any tangible objects related to the offense placed before the witness that would encourage identification?"

8. Appellant has not, either at trial or on appeal, made any claim that the Sixth Amendment comprehended a right to have counsel present at the showing of the color photographs to the eye witnesses. Nonetheless, we deferred the decision of this case pending the consideration and disposition by the court en banc of United States v. Ash, 149 U.S.App.D.C. —, 461 F.2d 92 (decided March 1, 1972), in which the court explored such an issue in the case of a man in custody and awaiting trial. We held in *Ash* that a photographic showing can under certain circumstances be a critical stage in the prosecution calling for the presence of counsel.

That principle so recogized in *Ash* does not govern this case, however, because appellant was not in the custody of the D.C. police at the time the photographs were exhibited to the eyewitnesses. So far as the D.C. crime was concerned, the showing took place at a time when that matter was still in the investigative stage. It is true that appellant was physically in the custody of the Virginia police, but that was for a crime unrelated to the one in the District of Columbia. The tip to the D.C. police arising from the Virginia arrest made appellant a suspect, but only that; and it was entirely reasonable for the D.C. police to pursue that lead by obtaining photographs of appellant and exhibiting them to the eyewitnesses in the District. On these facts, this showing did not constitute a critical stage in the prosecution of appellant.

delayed. White's testimony as to this matter confirms that of Wheeler, except that White's recollection did not extend to his saying anything to Wheeler about the delay. In any event, there is nothing to suggest that this confrontation between Wheeler and appellant was anything other than a matter of chance. This is supported even by the testimony of appellant's father for the defense, who said that he saw White and Wheeler approaching in their car as he was walking with appellant from the jail to the court house. It is obvious that the judge did not credit the testimony of appellant himself that both Wheeler and White were at the preliminary hearing.

■ Under the circumstances revealed in this record, we do not view the street confrontation as wanting in due process, and testimony as to that identification was validly admitted into evidence. Long v. United States, 137 U.S. App.D.C. 311, 315–316, 424 F.2d 799, 803–804 (1969).

The second matter relied upon by appellant also is characterized by some conflict in the testimony. Lieutenant White testified that, while arranging the lineup, he did invite appellant to move to any position he preferred, but that this was not done while Wheeler was in the room. Wheeler himself testified that he was not taken into the room until the lineup had been arranged for his viewing, and that he recognized appellant instantly upon seeing the lineup. Davenport, the substitute counsel, first said that Wheeler was in the room when he (Davenport) arrived, but later modified his testimony to embrace the possibility that Wheeler had been sent to a nearby room while the lineup arrangements were made, including the shifting of position by appellant. Appellant's father said that Wheeler was not in the room itself during the arrangement of the lineup, but was standing with him out in the hallway. Appellant contradicts this testimony by saying that Wheeler was present in the room throughout the arrangement of the lineup by White.

■ We think that inescapably implicit in the court's denial of the motion to suppress was the acceptance by it of the testimony of Wheeler and White that Wheeler was not in the room during the arranging of the lineup; and the conclusion that Wheeler did not hear White address appellant in connection with the changed position. There is ample support in the record for such a resolution of these factual questions; and, so resolved, there is no basis for holding Wheeler's identification evidence to be tainted by the lineup viewing.

It is, of course, true that the lineup itself appears not to have been held under ideal conditions, such as those as presumably would have obtained if the lineup had been held at police headquarters in Washington. But appellant was in the custody of the Virginia police for a Virginia crime, and Lieutenant White was in Manassas on an investigating mission. That mission was to see if an eyewitness to the crime—Wheeler—could identify appellant; and it was thought that a lineup was, as this court has so often said, the best and fairest means to this end. The record suggests to us that Lieutenant White made a sincere effort to hold the best lineup he could under the circumstances, including the provision of substitute counsel.

That counsel was a reputable attorney in Manassas and his testimony fulfilled one of the functions which, in the view of the Supreme Court, the presence of counsel at a lineup is conceived of as assuring, namely, the accurate reconstruction at trial of the circumstances of the lineup. Davenport's testimony suggests that he did not have as much opportunity as he would have liked to make representations about the circumstances of the lineup, but his testimony shows that he was in the room when White invited appellant to take any position he chose as part of the arrangement of the lineup, and presumably appellant's selection met with Davenport's approval. Davenport's reservations about the lineup seem, from his testimony, to have derived mainly from the small and crowd-

ed character of the room, and not to the constitution of the lineup itself.

■ We do not find in all this any purpose on the part of Lieutenant White to rig the lineup against appellant, nor do we find that on this record the circumstances of the lineup failed to meet the requirements of due process of law. Although appellant has not taken exception on this appeal to the effectiveness of the assistance rendered him by Davenport, we note that we see nothing in the record which compels that characterization.[9]

The judgment of conviction is affirmed.

It is so ordered.

FAHY, Senior Circuit Judge (dissenting):

My disagreements with the foregoing opinion are that it finds no error in the admission in evidence at trial of the identification of Neverson outside the jail in Virginia,[1] the immediately ensuing lineup identification inside, and the absence of findings by the trial court, respecting both these identifications. The outside identification I conclude violated due process, and should have been excluded under United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). The lineup identification I conclude violated both the Fifth Amendment (due process) and the Sixth Amendment (right to counsel), under both *Wade* and Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967), and our en banc decision in Clemons v. United States, 133 U.S.App.D.C. 27, 408 F.2d 1230 (1968). The absence of findings I think constituted error under the court's en banc decision in Unit-

ed States v. Ash, 149 U.S.App.D.C. ——, 461 F.2d 92 (1972), and well-established general principles of law.

## THE VIRGINIA PRE–LINEUP IDENTIFICATION

Some two weeks after the robbery in this city, appellant was arrested in Virginia for a crime committed there. Circumstances referred to in the court's opinion quite naturally led the Virginia authorities to communicate with the authorities in Washington that the man held in Virginia, Neverson, might be the one sought for the Washington robbery. Accordingly, Lieutenant White, of Washington, arranged for Mr. Herbert A. Wheeler, a witness to the Washington robbery, to accompany him to Manassas where Mr. Neverson was being held.

At the hearing on the motion to suppress the lineup identification Mr. Wheeler testified on cross-examination as follows:

Q Mr. Wheeler, when you went to Virginia, did you at any time see the defendant before the line-up?

A Yes, I did.

Q When did you see him?

A They were taking him from the jail to the courthouse.

Q Was that the same day as the line-up?

A Same day.

Q Just before the line-up?

A Yes.

\* \* \* \* \* \*

Q Did Lt. White mention anything to you as you saw the defendant walking across the courtyard?

A Yes. He say he was supposed to be down there at 10:00 o'clock for a

---

9. The testimony about the lineup reproduced in the dissenting opinion is replete with direct conflicts; and the dissent appears unwilling to infer that the trial court's ruling upon the motion to suppress necessarily rests upon its resolution of those conflicts in favor of the prosecution. We think, as we have said, that the denial of the motion must be taken as reflecting such a resolution, and that

on this record it was one fully within the province of the trial judge to make.

1. When this encounter occurred Neverson was being taken across an area in the vicinity of the jail and the courthouse. Whether he was going from the former to the latter or vice versa is immaterial. The testimony is not quite clear about that. It is clear he was being taken to the lineup in police custody.

line-up, but they were taking him to a trial or something.

Q And he pointed out the defendant?

A No, he did not.

Q Did you get the impression that it was the defendant that they were taking to the trial?

A Just like I say, I had seen the man before.

\* \* \* \* \* \*

THE COURT: And you say you saw this man, the defendant, that is, here, you saw him before you got to the place where they were having the line-up that day?

THE WITNESS: I saw him before I ever went into the jail. We were coming into, I guess you say, the parking lot. And they were going across to jail to the courthouse, I guess.

THE COURT: How many people were going across when you say "They"?

THE WITNESS: It was with two policemen and this one man or two more men were with him.[2]

\* \* \* \* \* \*

THE COURT: Including this one?

THE WITNESS: Yes.

THE COURT: This gentleman and somebody else? Is that right?

THE WITNESS: Yes, ma'am.

\* \* \* \* \* \*

THE COURT: Did you recognize the man at that time or not?

THE WITNESS: Yes, ma'am. I have seen that man before. So when we got in the parking lot, he say, Sgt. White says that we may be late, because it looks like they were taking them to the courthouse for something.

\* \* \* \* \* · \*

Q When Sgt. White mentioned to you that it looked like the line-up would be late, because they were leading him over to a hearing, was this at the same time that the defendant was being led over by these gentlemen to the hearing?

A Yes, it was the same day.

Q Did Lt. White sort of indicate that there he was, they were leading him to the hearing?

A No, he did not.

At the trial, the pre-lineup incident outside is described by Mr. Wheeler on cross and on re-direct as follows:

On Cross:

Q When you went out to the line-up, did you see the defendant at all before the line-up?

A Yes, I did.

\* \* \* \* \* \*

Q While he was walking across the outside of the line-up room?

A Yes.

\* \* \* \* \* \*

Q Did you recognize him at all while he was walking there?

A Yes, I recognized him.

On Re-direct:

Q When you said you went down to Virginia to view this line-up, you said you saw the man earlier.

\* \* \* \* \* \*

Q You just recognized him there in the courtyard or whatever it was?

A I recognized him, yes.

This identification in my opinion not only precluded the validity of the lineup identification which almost immediately ensued, to be discussed more fully, but because of its impermissibly suggestive circumstances was itself inadmissible. The court's reliance upon the unplanned character of the encounter seems quite contrary to United States v. Wade, 388 U.S. at 229, 87 S.Ct. at 1933, where it is said, "Suggestion can be created intentionally or unintentionally in many subtle ways," and, of course, in unsubtle ways.

---

**2.** I note that at one point in his testimony at the hearing on the motion to suppress he said there were three men, other than the two policemen, in answer to leading questions.

As we have seen, Mr. Wheeler testified of this encounter that he was aware that the authorities were taking Neverson from the jail to the courthouse. To repeat, "just before the line-up," Lieutenant White mentioned to Mr. Wheeler that "he (White) was supposed to be down there by 10 o'clock for the line-up but they were taking him to a trial or something," obviously referring to Neverson. Although it is not clear whether Lieutenant White actually mentioned Neverson's name, it seems inescapable that the reference to Neverson, as he was being led across the courtyard a short distance from Lieutenant White and Wheeler, was Lieutenant White's confirmation of the identity of the man Wheeler testified he then recognized and a little later picked out in the lineup. The situation in Long v. United States, 137 U.S.App.D.C. 311, 424 F.2d 799 (1969), cited by the court, was altogether different. The fortuitous elevator-lobby identification there was not accompanied by police commentary upon the identity of Long. Here Lieutenant White indicated that the suspect was being taken "to a trial or something." Moreover, the trial judge made no finding about this identification. I think a finding of no impermissible suggestiveness could not be made. Be that as it may none was made. The admission of this identification at trial seems clearly to have violated due process of law under *Wade* and our decisions, aside from the necessity of findings offered to support a contrary position.

## THE LINEUP IDENTIFICATION

1. The lineup followed upon the heels of the courtyard identification of Neverson by Wheeler. The immediately preceding identification alone, in my opinion, precluded the admissibility of the lineup identification. One of the impermissibly suggestive procedures enumerated in *Wade* is when "the suspect is pointed out before or during a lineup." 388 U.S. at 233, 87 S.Ct. at 1935. This, as we have seen, is effectively what had occurred here.

The lineup technique is designed to insure trustworthiness arising from its own arrangements. Ordinarily it must consist of an array of persons from which a witness might identify the perpetrator of an offense. The desired trustworthiness is lost when the suspect in police custody is identified, as here, quite independently just prior to the lineup. If this is permissible, as the court now holds, it would seem to destroy the lineup technique as a means of obtaining admissible evidence consistently with due process of law. No authority is advanced to support the admission at trial of such an identification.

2. Apart from the above, as I shall try to explain, the substantive right of the suspect to counsel at a lineup identification was not granted as *Wade* holds the Sixth Amendment requires. Preliminarily, reference is made to the recent en banc decision of this court in United States v. Ash, 149 U.S.App.D.C. at ——, 461 F.2d at 92, where United States v. Allen, 133 U.S.App.D.C. 84, 408 F.2d 1287 (1969), is cited approvingly, and on its authority the court suggests again that out of "an abiding concern for an interest in ensuring a combination of fairness and intelligent and effective technique in law enforcement," as a means of safeguarding the fairness of identification procedures, counsel should be given prior to the lineup any description of the suspect given to the police by the lineup witness. *See also* Spriggs v. Wilson, 136 U.S.App.D.C. 177, 419 F.2d 759 (1969). *Allen* also sets out other steps which, if taken, would contribute to the trustworthiness of a lineup:

First, we note that the presence of counsel at a lineup serves not only to allow an informed challenge to be made to identification evidence at trial, but also "to minimize the likelihood of an unduly suggestive confrontation."[7] It would seem that appellant's counsel might best be able to serve his client's interest and the interest of justice if he is given in advance of the lineup the names of the witnesses who would attend; the

time, place and nature of the crimes involved; and the descriptions of the suspect, if any, which the witnesses had given to the police. Counsel also might be allowed to have a role in setting up the lineup and proposing changes to avoid suggestive features. If such a procedure were followed, it might well be that, absent plain error or circumstances unknown to counsel at the time of the lineup, no challenges to the physical staging of the lineup could successfully be raised beyond objections raised at the time of the lineup. (Footnote omitted)

133 U.S.App.D.C. at 86, 408 F.2d at 1289.

"Substitute" counsel was called for the Manassas lineup. What occurred is quite remarkable. Not only was substitute counsel not given in advance of the lineup (1) the name of the witness who would attend, (2) the time, place and nature of the crimes involved, (3) nor any descriptions of the suspect which the witnesses have given to the police, the attorney's testimony, now to be quoted, clearly negates the substantive right to counsel. Mr. Davenport was the counsel. He testified for the defense on the motion to suppress the lineup identification. This is what he said: He practiced law in Manassas directly across the street from the courthouse and jail, and then,

A   I was in my office [on May 28, 1968] when I received a call to come over to the jail with regard to Mr. Neverson. And I went over to the jail to find out what I was wanted for.

Q   What happened when you received this call, then, to go over to the jail? When you got there, what did you see?

A   There seemed to be some urgency, so I completed the telephone call, the other call I was on, and immediately trotted across the street and went into the jail room, that is, the jailer's room which is right outside of the lock up. And a gentleman approached me and, if I remember cor-

rectly, identified himself as a Deputy Marshal, I believe he said, from D.C. And told me that he would like me to be present, since Neverson was there, and, if I recall correctly, I am not sure that he used his name.

In any case, he said there was to be a line-up and it was required that an attorney be present when a line-up was held.

[The room was then described]

\*   \*   \*   \*   \*   \*

I was conscious of him [Neverson] standing over here near this door. And when the Marshal told them to line up, he ended up on this end and then there was some shuffling. I am afraid I couldn't quote the exact words, but, in any case, as I recall, it was indicated that Mr. Neverson should move from where he was over into the center.

The witness who was the identifying witness was present during all of this. And Mr. Neverson was shifted around, then, and put in the center of the line-up.

\*   \*   \*   \*   \*   \*

I do not recall that there was any use of names. But he was singled out to change his position.

BY MR. WARREN:

Q   Now it is your recollection that the witness, the individual who was later identified as the witness, was present in the room at this time when all this took place?

A   Yes, sir. He was standing near this gentleman who identified himself to me as the Deputy Marshal. . . .

And I was also conscious of the fact that I had a house full of people waiting back at the office.

\*   \*   \*   \*   \*   \*

Q   Did you talk to Mr. Neverson, Gregory Neverson, at all during this procedure, either before or after?

A   I talked to him after that. And I had talked to him before that, yes.

Q With regard to the line-up at all?

A Negative.

\* \* \* \* \* \*

I remember questioning the Deputy Marshal as to why it was being conducted right now in such a big rush and also the manner in which it was done. But this all happened within a matter—very quickly after I came in the room.

There wasn't any explanation given to me, before it was done.

Q How long did the whole proceeding take, as best as you can remember?

A I think I was back in my office in five minutes, maybe eight. Of course, it only takes me about 30 seconds to walk across the street.

Q Were there any questions asked of you as to the composition of the line-up or if you agreed or disagreed with the way it was done?

A Negative. The only explanation that was given was that it was necessary for an attorney to be present. The only comment that I made was, "You are going to have it right here?" I believe I did say that. At that point it was in the middle of it. And they were shuffling people around.

THE COURT: Where do you customarily have your line-ups over there?

THE WITNESS: We do not have a line-up room. And in my six years as a Prosecutor and defense attorney for about another 10 or 12 after that, I don't recall attending a line-up.

THE COURT: You don't customarily have them?

THE WITNESS: No, ma'am.

BY MR. WARREN:

Q From your observation, do you feel that once you stepped in the door of that jail that you could then see or hear everything that went on in the small room?

A Yes. I was conscious of the fact that they were waiting for me. And, as soon as I arrived, things started moving.

\* \* \* \* \* \*

On cross-examination by the United States I find nothing of added significance except the following:

Q How far were you at any one time from the identifying witness that was brought down from Washington?

A Probably standing right alongside of him.

\* \* \* \* \* \*

Q So your testimony today is your reliance on remembering this for over a year's period of time, isn't it?

A Yes. You must recall, as I pointed out, it was the only one I ever attended. It does stand out.

\* \* \* \* \* \*

A When I was first conscious of him [Neverson], he was standing at the end of the group that subsequently were put into a line.

Q Did you watch him the rest of the time, until he was put in the line?

A I am not sure I know what you mean by watching.

Q Were you watching them arrange the line and that sort of thing from the time you first saw Mr. Neverson and so on?

A That is what I was there for.

Q You weren't watching the identifying witness then, were you?

A We were within a matter of three or four feet of each other. I wasn't paying that much attention to him, no.

Q He was back to your side or rear, was he not? The identifying witness?

A I have no idea.

Q You have no idea where he was while they were arranging the line?

A That was my testimony.

Q For all you knew, he could have been back in the radio room while the line was being arranged, couldn't he?

A That is possible. There was a man, as I told you, standing alongside the Deputy Marshal when I first went in and he later turned out to be the man who identified Mr. Neverson. What happened to him in the minute or so in between, I don't know.

In addition to Mr. Davenport's version of the conduct of the lineup, was the testimony of Mr. Wheeler, the witness, Lieutenant White, appellant's father, and, finally, appellant himself. Wheeler testified that he was not in the room where the suspects were being arranged for the lineup, that he waited in an adjacent room sipping coffee. He further testified that he spoke to no one prior to the lineup and that he noticed no suggestive activity by the authorities. Lieutenant White also testified that Wheeler waited in the adjacent room and that Wheeler neither spoke to anyone prior to the lineup nor witnessed any of the shuffling.

Appellant's father, on the other hand, testified that Lieutenant White mentioned appellant's name to Wheeler prior to the lineup and that both he and Wheeler watched the lineup arrangements. Appellant testified that both White and Wheeler appeared at the preliminary hearing, that both watched him being led handcuffed to his place in the lineup and that Wheeler witnessed the entire arrangement process, including hearing Lieutenant White call appellant by name.

It does not appear from Mr. Davenport's testimony, or otherwise, that he had been even advised he was to be counsel for anyone at the lineup. He was frank and honest and is no doubt an able lawyer, but he was unacquainted with lineups. During his approximately sixteen years of experience as county prosecutor and defense attorney customarily lineups had not been held in Prince William County, Virginia. His undisputed testimony demonstrates that he had no opportunity to be helpful except to be able at the subsequent trial to testify to that effect. He had hastened across the street at the request of the Manassas police with the simple explanation by the deputy marshal, as quoted by Mr. Davenport, "It was required that an attorney be present when a lineup was held." *Wade* requires the effective assistance of counsel because the Court recognized that this would be the best means of insuring against impermissible suggestiveness violative of due process. The requirement of counsel for purposes of giving advice to reduce suggestiveness, and for subsequently reconstructing the conduct of the lineup, so a trial court can measure its fairness, is a means to the end of fair lineups. And *Gilbert* makes it clear that due process does not tolerate the possibility of unfairness that accompanies uncounseled lineups outlawed by *Wade,* unless the lack of counsel results in error deemed harmless beyond a reasonable doubt. Mr. Davenport's testimony amply demonstrates that the Manassas lineup was effectively uncounseled, and the record is replete with inconsistencies as to whether the lineup was otherwise fair. For all he was able to contribute to the fairness of the lineup—through no fault of his own—Mr. Davenport was simply a passive and ignored witness to what occurred. This I think fails to serve, through the Sixth Amendment, the underlying Fifth Amendment due process purpose of *Wade.*

## THE ABSENCE OF FINDINGS

The District Court made no findings whatever as to the courtyard pre-lineup identification. As to the lineup identification, at the conclusion of the hearing on the motion to suppress the identifications, the court ruled first that the earlier photographic identifications were not suggestive. Turning to the lineup identification the court then said:

I find that he was corroboratively identified in the line-up by one of the complaining witnesses. Therefore, motion to suppress identification is denied.

**1238**

That is all. It is an explicit finding that an identification was made at the lineup, which of course is not disputed. There is no implicitness about the finding. It seems quite exclusive of any finding that the pre-lineup identification was not impermissibly suggestive, or that the lineup identification was not impermissibly suggestive, or that Neverson was adequately represented by counsel, or that the lineup identification was not affected by the pre-lineup identification, or as to any of the disputes in the evidence as to how the lineup was arranged and held. Our court concludes that the finding that the lineup identification corroborated the photographic identifications, followed by admission of the evidence of that identification, is a resolution of all disputed factual issues essential to a conclusion that the lineup identifications were held consistently with due process of law and the right to the effective assistance of counsel. Not only was the courtyard identification not even referred to by the trial court, either in and of itself, or in its relation to the lineup identification, but the above conclusion reached by our court seems to me quite inconsistent with the recent holding of this court en banc in *Ash,* in a different but comparable situation, as follows:

> Certainly the elements of suggestiveness were strong enough so that it cannot be assumed there was no undue suggestiveness, in the absence of explicit findings by the trial court.

149 U.S.App.D.C. at ——, 461 F.2d at 92.

CONCLUSION

Under Clemons v. United States, 133 U.S.App.D.C. at 34, 408 F.2d at 1237, I would hold that the admission at trial of the lineup identification requires a new trial under the *per se* exclusionary rule of Gilbert v. California, *supra,* unless the court is able to declare that the error was harmless beyond a reasonable doubt. Even if we could say that the *Gilbert per se* exclusionary rule does not apply, the erroneous admission in evidence at trial of both the pre-lineup and lineup identifications would in my view require reversal, or at least remand for findings, unless the admission of the evidence were also deemed to be harmless error. The court, however, does not find harmless error. It finds no error either in the admission of the evidence of both the Manassas identifications, or in the absence of findings. I disagree.