Cornelius A. CURETON, Appellant,

v.

UNITED STATES, Appellee.

No. 12057.

District of Columbia Court of Appeals.

Submitted Feb. 8, 1978.

Decided March 29, 1978.

Michael J. McCarthy, Washington, D. C., appointed by this court, for appellant.

Earl J. Silbert, U. S. Atty., Washington, D. C., with whom John A. Terry, Michael W. Farrell, Edward C. McGuire and Reggie B. Walton, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before KELLY, KERN and YEAGLEY, Associate Judges.

KERN, Associate Judge:

Following a jury trial, appellant was found guilty of assault with intent to commit robbery while armed, D.C.Code 1973, §§ 22–501, –3202. On appeal, appellant makes four assignments of error; viz., (1) the trial court's refusal to suppress testimony concerning the complainant's spontaneous and unsolicited identification of appellant upon sighting him in a police station house hallway; (2) the trial court's refusal to suppress his in-court identification by the complainant; (3) the trial court's denial of his motion for a judgment of acquittal made at the close of the prosecution's case and renewed at the close of all of the evidence; and (4) the purportedly inconsistent jury verdicts which acquitted appellant of carrying a pistol without a license while convicting him of one count of assault with intent to commit robbery while armed.[1] We affirm.

Because appellant's argument primarily focuses on an allegedly suggestive pretrial confrontation, and because of the unusual factual context from which this confrontation developed, we feel obliged to recount, at some length, the proceedings leading up to the trial and the in-court identification.[2]

### THE ROBBERY

During the early evening of January 15, 1975, Frank Robinson and his wife, Florence, were walking home from a birthday party for their grandchild. The couple was taking a shortcut through a schoolyard when they were approached by two young

---

1. Regarding appellant's contention that a judgment of acquittal should have been directed at the close of the prosecution's case, we conclude that the "circumstances surrounding the identification [by a single eyewitness] could be found convincing beyond a reasonable doubt." *Crawley v. United States*, D.C.App., 320 A.2d 309, 311 (1974). Concerning appellant's fourth contention, inconsistent verdicts such as those returned here are not inappropriate.

2. This approach is necessary since, assuming the postidentification "confrontation" was suggestive, the "central question" is "whether under the 'totality of the circumstances' the identification was reliable." *Neil v. Biggers*, 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972) (identification of the accused at a station house showup seven months after the offense).

men armed with pistols. One of the men demanded the Robinsons' money. Frank Robinson, thinking the incident was "some kind of game," told his wife to keep walking. One of the men then grabbed Florence Robinson's purse. A brief struggle for the purse followed. The assailant then placed his pistol near Florence Robinson's head and threatened to "blow her brains out" unless she released the purse. As Florence Robinson relinquished her purse, Frank Robinson told his wife to run as he rushed her assailant, knocking him momentarily to the ground. This gunman, upon recovering, then fled the scene, purse in hand. While Florence Robinson was attempting to escape, the second assailant who had been holding Frank Robinson at gunpoint, fired four shots in her direction. The gunfire frightened Florence Robinson, causing her to cry out. Upon hearing his wife's cry, Frank Robinson mistakenly concluded that she had been wounded and, in an attempt to protect her, purposefully stepped into the gunman's line of fire. As a result, Robinson was shot once in his right shoulder.

Robinson, although wounded, attempted to approach the remaining gunman and disarm him. The assailant retreated some distance and then struck Robinson once in the face with his pistol. The gunman again demanded Robinson's money and his watch. In response to these demands, Robinson stated that while he was carrying no money, he did have some food stamps, which the gunman then demanded. Robinson threw the food stamps to the ground and, in an attempt to escape, kicked the assailant in the face as he stooped to retrieve them. The assailant then fled.

When interviewed at the hospital shortly after the robbery, Frank Robinson provided the police with a description of the two men.[3] Florence Robinson, while able to corroborate her husband's rendition of these events; *viz.,* that they were assaulted by two young black men, one of whom stole her purse while the other shot her husband, was unable to describe either assailant.[4]

## THE LINEUP

The Robinsons, accompanied by their granddaughter, attended a lineup 12 days after the robbery. While his wife was unable to make an identification, Frank Robinson identified appellant as the assailant who robbed and shot him. The validity of this lineup identification, although the subject of a pretrial suppression motion below, is not challenged by appellant on appeal.[5]

Although appellant describes Frank Robinson's lineup identification as "hesitating," this characterization is not completely supported by the record. During the suppression hearing and at trial, Frank Robinson

3. Robinson described the assailant who robbed his wife as a slender black male between 16 and 17 years of age who was wearing a dark brown sweatshirt and dark brown pants. Robinson also noticed that this individual was clean-shaven and had pulled the sweatshirt hood over his head during the robbery. Robinson further noted that this assailant weighed approximately 125 pounds, was 5'9" in height and was armed with a dark handgun.

Robinson described the assailant who shot and robbed him as a dark-skinned black male between 17 and 18 years of age who was wearing a short, blue and white checkered coat and dark pants. This individual had a small mustache, a "short-bush" hair style, weighed approximately 150 pounds, was 5'6" in height, and was armed with a small, nickel-plated revolver.

At the suppression hearing, the trial court characterized Robinson as "a very candid individual and one who was rather meticulous in his description of the events of [the robbery]."

4. At trial, Florence Robinson's testimony indicates that she was sufficiently frightened during the robbery to be unable to precisely recall all the details of the incident. She admitted that she was "scared" during the robbery and that all she could remember was her flight and the general outlines of the episode.

5. At the conclusion of a lengthy hearing on appellant's motion to suppress the lineup identification, the trial court concluded, *inter alia*:

The court has examined the photograph of the lineup . . . and finds that there is no suggestibility with respect to the lineup, nor does the defendant . . . stand out in such a manner as to provoke identification. The lineup would appear to be representative in a fair sense of young black males generally fitting the description offered by the complaining witness.

adamantly asserted that he identified appellant at the lineup as the man who shot, robbed, and struck him in the face with a pistol. Robinson also testified that he identified appellant at the lineup by both his facial features and his voice. According to Robinson's testimony, this identification occurred without hesitation.[6]

During trial and the suppression hearing, Robinson's testimony enumerated the factors underpinning his lineup identification of appellant. During most of the robbery, appellant was the gunman standing nearest to Robinson.[7] Although some of the lights in the vicinity of the schoolyard were inoperative,[8] at least three nearby street lights illuminated the area.[9] Moreover, as Robinson struggled with the remaining assailant during the later stages of the robbery, the pair moved from a darker area of the schoolyard to a more illuminated location.[10] According to Robinson, his food stamps were taken when he was "under the light."[11]

Robinson's lineup identification is also bolstered by the fact that, according to his testimony, he observed appellant for at least 15 minutes during the robbery.[12] These observations were made at close range. Robinson stated that the assailants were "close enough to put . . . [my] hand on one of them." During further testimony, Robinson noted that he and appellant were standing "face to face" when appellant "stuck the gun . . . in my nose." Finally, Robinson testified that he and appellant were in the most brightly-lit section of the schoolyard, at a distance of three to four feet, for approximately five minutes.

## THE POST LINEUP IDENTIFICATION AND THE SUPPRESSION HEARING

After he identified appellant in the police lineup, Frank Robinson, his wife, and granddaughter, were waiting in the station house hallway for an elevator. Appellant, in handcuffs and accompanied by a police officer, was in the process of being returned to jail. The policemen and appellant entered the elevator along with Florence Robinson and the granddaughter. Frank Robinson, engaged in a conversation with a policeman, did not enter the elevator along with appellant and the others; instead, he rode in the next elevator. Upon rejoining the two women in the lobby, Robinson asked his granddaughter whether she was acquainted with the prisoner in the elevator. She stated that appellant was a for-

6. However, the transcript of the January 27, 1975 lineup does cast some doubt on Frank Robinson's testimony at trial that he *promptly and unequivocally* identified appellant. The transcript suggests that the identification was based, at least in part, on Robinson's recognition of appellant's voice. Moreover, Robinson's identification of appellant is recorded in the lineup transcript as: "I recognize number three [the appellant] was [the] one doing the talking to me. I don't know—I can—I know that voice."

7. During most of the robbery, Frank Robinson was closer to both gunmen than was his wife.

8. Florence Robinson's testimony regarding the lighting at the scene of the crime contradicted that of her husband. She testified that the area was unlighted.

9. At trial, testimony regarding measurements taken by the police indicated that the point at which the Robinsons were initially approached by the gunmen was 50 feet from the nearest light and 80 feet from the most distant.

10. Robinson testified that after the shooting, the remaining gunman continually retreated as he edged closer in an attempt to disarm him. In the process of withdrawing as Robinson advanced, the gunman moved toward the lights.

11. At trial, testimony regarding measurements taken by the police indicates that Robinson threw down his food stamps at a point 15 feet from the nearest streetlight.

12. Robinson's granddaughter testified that he returned to the birthday party about 15 minutes after he had departed. The granddaughter further testified that six minutes would be required to walk from the party to the schoolyard. From this testimony, appellant concludes that the robbery required no more than 3 minutes to complete rather than the 15 minutes recounted by Frank Robinson. However, appellant's argument assumes the granddaughter's computations were correct, made with chronometric accuracy, and that Frank Robinson's estimate was erroneous.

mer classmate with whom she was casually acquainted. Robinson then replied "that's the boy who shot and robbed me."

A hearing on appellant's motion to suppress Robinson's lineup identification was held immediately prior to trial on December 8, 1976. The trial court concluded, *inter alia,* that the lineup conducted twelve days after the robbery was not impermissibly suggestive, and, hence, evidence of that identification would be admissible at trial. During the suppression hearing, Frank Robinson, age 75, was *unable* to identify appellant as the man who had robbed and shot him 23 months earlier:

> Well . . . [the prosecutor] asked me if I saw anyone in the courtroom who robbed me. I told him the only guy I see in the room is the guy over there [the appellant]. I don't see anyone who participated in the robbery . . . the guy I picked out of the lineup, I don't see him.[13]

When Robinson's failure to identify appellant during the suppression hearing was probed by counsel, Robinson wavered somewhat and stated that he "couldn't be sure" whether appellant was the man he had identified at the lineup.

On December 9, 1976, additional testimony was heard on appellant's motion to suppress. Frank Robinson testified that after the December 8 suppression hearing, while he was waiting to be called as a witness at trial, he had observed outside the courtroom and in the courthouse cafeteria, the assailant who shot and robbed him. Although Robinson testified that this individual had *not* been present in court during the December 8, 1976 suppression hearing, testimony of his granddaughter and others indicates that the person Robinson had encountered was the appellant. When cross-examined by defense counsel, Robinson testified that his belated recognition of appellant stemmed primarily from observations made while sitting in the courthouse cafeteria:

> All I know is the one I saw out there today [in the cafeteria and hallway], I saw good, because I walked around in front of him and behind him—I got a good look both ways.[14]

At the close of the second day of testimony at the suppression hearing, the trial court ruled that Robinson would be permitted to attempt an in-court identification of appellant. The trial court also ruled that Robinson's granddaughter would be permitted to testify (1) as to Robinson's identification of appellant immediately following the lineup, and (2) as to Robinson's identification of appellant in the courthouse cafeteria.

At trial, the evidence adduced by the government was substantially similar to that presented during the two-day hearing on appellant's motion to suppress. While Florence Robinson was unable to make an in-court identification of appellant, Frank Robinson did identify appellant in court as the man who robbed and shot him 23 months earlier. Although Robinson was extensively cross-examined regarding his inability to identify appellant in person during the suppression hearing on December 8, 1976, he emphatically maintained that appellant was the man he had identified at

---

**13.** In spite of his apparent confusion during the suppression hearing, Frank Robinson adamantly maintained that the individual he identified at the lineup was one of the assailants:

> I picked the guy out of the lineup by—just like you hold a picture before your eyes, like you showed me a picture. And I pictured this in my mind the whole time I was shot. . . . I could see the guy standing in front of me and I could hear him standing talking to me, commanding my food stamps and my money. And that's pictured in my mind the whole time.

Moreover, during the suppression hearing, Robinson *did identify appellant from a photograph* of the January 27, 1975 lineup.

**14.** At the time of these sightings, appellant was not in custody, but was eating in the courthouse cafeteria with his family during a recess at the suppression hearing. The record also indicates that Robinson's recognition of appellant during the lunch recess was spontaneous and not prompted or solicited by his granddaughter who was acquainted with appellant or by any action of the police or prosecution. As stated by the trial court:

> There is no indication that the police in any way arranged this confrontation or that the government is responsible for it, and that, indeed, there would be an independent source for his in-court identification as an alternative finding.

the lineup as one of his assailants. The following colloquy is representative:

> DEFENSE COUNSEL: On Wednesday [at the suppression hearing] when you said the man who robbed you wasn't in the courtroom, did you have an opportunity to observe everyone in the courtroom.
>
> ROBINSON: Yes.
>
> DEFENSE COUNSEL: And the man wasn't here Wednesday?
>
> ROBINSON: I said the man wasn't here Wednesday I picked out of the lineup . . .
>
> DEFENSE COUNSEL: All right. Is the man you picked out in the lineup in the courtroom today?
>
> ROBINSON: Yes.
>
> DEFENSE COUNSEL: Well, is that the same man who was here Wednesday?
>
> ROBINSON: Yes.
>
> DEFENSE COUNSEL: Well, now, on Wednesday, you said the man you picked out of the lineup wasn't in the courtroom.
>
> ROBINSON: I still say it.
>
> DEFENSE COUNSEL: Now Mr. Robinson.
>
> ROBINSON: See, I thought I explained that to you. You understand, I explained that to you over and over. . . I said that in nearly two years time that anyone had grown more hair, more mustache. . . . [So] I look over at the [accused] and you all are shooting questions at me and I told you he wasn't in the courtroom, not the man I picked at the lineup. And you called me back Wednesday and asked me the same and I still stick to that. And the first time I got chance enough to even observe the man and look him over back to front was yesterday in the cafeteria.

At trial, Robinson attributed his inability to identify appellant at the suppression hearing conducted two days before to (1) the lapse of nearly two years since the offense, (2) changes in the length of appellant's hair and mustache, (3) the aggressive questioning by defense counsel, (4) differences in appellant's appearance due to his clothing and the courtroom lighting,[15] and (5) his opportunity to observe appellant more fully in the courthouse cafeteria and hallway. Robinson also testified that he had been in prison himself and did not want to be responsible for incarcerating anyone.

## THE HALLWAY CONFRONTATION AND IN–COURT IDENTIFICATION

Appellant's contentions stem from the trial court's refusal to suppress testimony concerning an identification of him made in the station house hallway following the lineup. Appellant characterizes this incident as an unnecessarily suggestive "de facto showup" since he was in custody at the time the complainant observed him. Appellant further contends that this hallway confrontation irreparably tainted the complainant's in-court identification as well, and thus, the trial court committed error when it ruled that the complainant would be permitted to attempt an in-court identification.

■ The Supreme Court has dealt with pretrial identification procedures in a series of decisions spanning the last decade. These procedures are subject to two separate avenues of attack: due process and right to counsel.[16] Here, appellant's argu-

---

**15.** During the trial, Robinson stated that appellant's clothing and the courtroom lighting made his skin appear darker than it did in the cafeteria.

**16.** A chance or accidental encounter with a witness does not necessarily infringe an accused's Sixth Amendment right to counsel. *United States v. Furtney,* 454 F.2d 1, 3 (3rd Cir. 1972) (right to counsel applies only to intentional pretrial confrontations between the complainant and the accused); *United States v. Conner,* 149 U.S.App.D.C. 192, 193, 462 F.2d 296, 297 (1972) (unintended station house con-

frontation not defective on ground that the accused was without counsel); *United States v. Seader,* 440 F.2d 488, 496–97 (5th Cir. 1971) (complainant spontaneously recognized accused during station house booking process; complainant present at police request to identify another suspect; complainant did not notice that accused was handcuffed); *Cefalo v. Fitzpatrick,* 434 F.2d 187, 188 (1st Cir. 1970) (fortuitous confrontation between witness and accused near station house entrance; accused in handcuffs) (dicta). *See Long v. United States,* 137 U.S.App.D.C. 311, 314–16, 424 F.2d

ment is couched in terms of due process.[17]

■ An abbreviated review of recent Supreme Court decisions defining the contours of due process in cases such as this indicates that they "are not uniform in their emphasis." *Manson v. Brathwaite*, 432 U.S. 98, 106, 97 S.Ct. 2243, 2249 n.9, 53 L.Ed.2d 140 (1977). In *Stovall v. Denno*, 388 U.S. 293, 301–02, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967) the Court reviewed the practice of showing a suspect singly to the complainant for purposes of identification and concluded that such out-of-court identifications would constitute a denial of due process if, considering the "totality of the circumstances," the "confrontation was . . . *unnecessarily suggestive and conducive to irreparable mistaken identification*" (emphasis added). Subsequently, in a case involving the admission of in-court identification testimony which arguably stemmed from the witness' exposure to a suggestive photographic array, the applicable due process standard was stated as:

[considering each case on its own facts,] convictions based on eye-witness identification at trial will be set aside on that

ground only if the photographic identification procedure was so *impermissibly suggestive* as to give rise to *a very substantial likelihood of irreparable misidentification.* [*Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968) (emphasis added).]

However, in *Neil v. Biggers*, 409 U.S. 188, 198, 93 S.Ct. 375, 381, 34 L.Ed.2d 401 (1972), the Court again considered the scope of due process protections against the admission of evidence derived from suggestive identification procedures and announced that "[s]ome general guidelines emerge from . . . [our] cases as to the relationship between suggestiveness and misidentification." First, "the primary evil to be avoided is 'a very substantial likelihood of irreparable misidentification.' *Simmons v. United States, supra* at 384, 88 S.Ct., at 971." *Neil v. Biggers, supra*, 409 U.S. at 198, 93 S.Ct. at 381.[18] Second, the fact a pretrial confrontation is unnecessarily suggestive does not automatically require the exclusion of the identification made. *Neil v. Biggers, supra* at 198–99, 93 S.Ct. 375.[19] Ultimately,

799, 802–04 (1969) (complainant's spontaneous recognition of accused in station house lobby and elevator constituted an independent source permitting an in-court identification).

17. We note, at the outset, that the Supreme Court has on six occasions considered the scope of due process protection against the admission of evidence purportedly tainted by suggestive identification procedures. Only in *Foster v. California*, 394 U.S. 440, 442–43, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969) (suggestive lineup and showup) were the pretrial identification procedures found to be violative of due process. Due process attacks were rejected in *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977) (identification from single photograph); *Neil v. Biggers, supra*, 409 U.S. at 200–01, 93 S.Ct. 375 (station house showup); *Coleman v. Alabama*, 399 U.S. 1, 5–6, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970) (lineup); *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968) (identification from a photographic array); *Stovall v. Denno*, 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1969) (showup conducted in victim's hospital room).

18. In *Simmons v. United States, supra* at 383, 88 S.Ct. at 971, the Supreme Court recognized that an identification made under suggestive

circumstances could result in a continuing taint of later nonsuggestive identifications:

regardless of how the initial [tainted identification] comes about, the witness thereafter is apt to retain in his memory the image of the photograph rather than of a person actually seen, reducing the trustworthiness of subsequent lineup or courtroom identification.

*See Manson v. Brathwaite, supra*, 97 S.Ct. at 2257 (Marshall, J., dissenting).

19. *Neil v. Biggers, supra*, 409 U.S. at 198, 93 S.Ct. at 381 enunciated a possible standard to be applied in a determination of whether the introduction of testimony concerning an *out of court* identification offended due process:

the primary evil to be avoided is "a very substantial likelihood of irreparable misidentification" . . . [citation omitted]. While the phrase was coined as a standard for determining whether an *in-court identification* would be admissible in the wake of a suggestive out-of-court identification, with the deletion of "irreparable" it serves equally well as a standard for the admissibility of testimony concerning the *out-of-court identification itself.* (Emphasis added.)

This articulation of the scope of due process would permit the introduction of testimony concerning an unnecessarily suggestive out-of-court identification provided "no very substan-

the "central question" is whether "the identification was reliable even though the confrontation procedure was suggestive." *Id.* at 199, 93 S.Ct. at 382. *Accord, Dyas v. United States,* D.C.App., 376 A.2d 827, 830 (1977); *Thornton v. United States,* D.C. App., 357 A.2d 428, 438 (1976). In effect, the admission of testimony "concerning a suggestive and unnecessary identification procedure does not violate due process so long as the identification possesses sufficient aspects of reliability." *Manson v. Brathwaite, supra,* 97 S.Ct. at 2249. Moreover, the due process analysis suggested in *Neil v. Biggers, viz.,* balancing the reliability of the identification against the corrupting effect of its suggestivity is to be applied in "both pre and post-*Stovall* confrontations." *Id.*

■ The factors to be considered in an evaluation of the reliability of an admittedly suggestive identification were set out in *Neil v. Biggers, supra,* 409 U.S. at 199–200, 93 S.Ct. 375, and cited with approval in *Manson v. Brathwaite, supra* at 97 S.Ct. 2253. These include (1) the opportunity of the witness to view the criminal during the crime, (2) the witness' degree of attention, (3) the accuracy of his prior description of the criminal, (4) the level of certainty demonstrated at the confrontation, and (5) the time between the crime and the confrontation. Against these indicia of reliability "is to be weighed the corrupting effect of the suggestive identification itself." *Manson v. Brathwaite, supra,* 97 S.Ct. at 2253. On balance, reliability is to be the linchpin in any due process analysis of the admissibility of both *pretrial and in-court* identifications. *Neil v. Biggers, supra,* 409 U.S. at 198–99, 93 S.Ct. 375; *Manson v. Brathwaite, supra,* 97 S.Ct. at 2249 n.9.

tial likelihood of misidentification" was shown. *Neil v. Biggers, supra,* 409 U.S. at 201, 93 S.Ct. at 383. However, in *Manson v. Brathwaite, supra,* 97 S.Ct. at 2254, the Court appeared to return to the standard announced in *Simmons*: we cannot say that under all the circumstances of this case there is "a very substantial likelihood of irreparable misidentification." *Simmons v. United States,* 390 U.S. at

■ Application of this five factor analysis to the facts of this case persuades us that due process was not offended by the admission at trial of testimony describing the complainant's identification of the accused in the hallway outside the room in which the lineup was conducted.

*The opportunity to view.* Robinson testified that for at least 15 minutes he stood within a few feet of the appellant, both when he was held at gunpoint and during the ensuing struggle. Even if we were to accept appellant's contention that only a few minutes elapsed during the robbery, the complainant would not necessarily have been deprived of a sufficient opportunity to observe his assailant. *Manson v. Brathwaite, supra,* 97 S.Ct. at 2246, 2261 (15 to 20 second observation of the accused by a single policeman during a five or seven minute drug transaction); *Coleman v. Alabama,* 399 U.S. 1, 4, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970) (fleeting but "real good look" at the assailant in the headlights of a passing car). Although the robbery occurred after dark, artificial lighting illuminated the area and the complainant testified that he was robbed while standing under a streetlight. The complainant also testified that he and the assailant were in the most brightly lighted portion of the schoolyard for approximately five minutes.

*The degree of attention.* While the complainant was not a trained police officer on duty, as was the sole eyewitness in *Manson v. Brathwaite, supra,* 97 S.Ct. at 2253, neither was he a casual or passing observer. A fair reading of the record suggests that Frank Robinson paid close attention to detail during the robbery. At the conclusion of the suppression hearing, the trial judge, who was able to evaluate Robinson's demeanor and assurance, noted that:

384, 88 S.Ct., at 971. Short of that point, such evidence is for the jury to weigh.
Regardless of the precise verbal shorthand used to express the applicable standard, the linchpin of this due process analysis is the identification's reliability. *Manson v. Brathwaite, supra,* 97 S.Ct. at 2253; *Neil v. Biggers, supra,* 409 U.S. at 199, 93 S.Ct. 375.

[the complainant] came across to this court as a very candid individual, and one who was rather meticulous in his description of the events of that night.

\* \* \* \* \* \*

. . . he was positive in his assertion that the face of the defendant stood out in his mind and memory.

*The accuracy of the description.* The complainant's description of the two assailants was given to the police on the night of the offense. It included his assailants' race, sex, age, height and weight. Also described were their hair style, facial hair, skin color, clothing, and the type of weapon employed by each. No substantial claim has been made that appellant did not possess the general physical characteristics so described.[20] Twelve days after the robbery, the complainant identified appellant at a fairly conducted lineup.

*The witness' level of certainty.* There is no dispute that Frank Robinson identified appellant at the lineup, although the degree of assurance with which this identification was made is questioned by appellant. At the suppression hearing, although he identified appellant from a photograph of that lineup, he was initially unable to identify appellant in the courtroom. Robinson repeatedly stated with assurance at the suppression hearing that he was certain that the individual he selected from the lineup was the gunman who robbed and shot him. Similarly, there is no question whatsoever concerning the certainty with which Robinson made the challenged hallway identification *which occurred shortly after the lineup.*

*The time between the crime and the confrontation.* The lineup identification occurred 12 days after the offense. Since such temporal proximity makes the identification more reliable than one occurring months later, this factor strengthens the accuracy of the identification in this case.

These indicia of Robinson's ability to reliably identify his assailant are not outweighed by the "corrupting effect of the challenged identification itself." *Manson v. Brathwaite, supra,* 97 S.Ct. at 2253. The hallway confrontation occurred shortly after Robinson had identified appellant at a lineup found to be fairly conducted. Since his ability to make an identification had been effectively tested at the lineup minutes before, we are convinced, after application of the "reliability" analysis outlined in *Manson v. Brathwaite, supra,* 97 S.Ct. at 2252, that the brief hallway encounter did not create a " 'very substantial likelihood of irreparable misidentification.' " *Manson v. Brathwaite, supra,* 97 S.Ct. at 2254, *quoting Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967 (1968).[21] As a result, the trial court did not err when it permitted the admission of testimony concerning the hallway confrontation. Consequently, no error was generated when the trial court then permitted the complainant to attempt an in-court identification of appellant. Any shortcomings in the hallway confrontation are not, according to the Supreme Court, "to be enforced . . . by a rigorous and unbending exclusionary rule. The defect, if there be one, goes to weight and not to substance." *Manson v. Brathwaite, su-*

---

**20.** Testimony was presented at trial to the effect that appellant did not own a coat similar to that worn by the assailant who shot and robbed Frank Robinson. An apparent discrepancy also exists between appellant's height and that of the assailant as described by Frank Robinson. However, testimony at trial; *viz.,* that the gunman was "shoulder height" in comparison to Frank Robinson, who stood 5'8", indicates that this aspect of the description was accurate in fact although erroneously expressed in feet and inches. Since the second gunman was never apprehended, the accuracy of this portion of Robinson's description cannot be verified. While this indicium of reliability;

*i. e.,* the accuracy of the offender's description, is the least persuasive in this case, it fails to seriously undermine our conclusion that, after an evaluation of all the circumstances, the in-court and out-of-court identifications were sufficiently reliable to merit their submission to the factfinder.

**21.** On the facts of this case, it would be unreasonable to conclude that Robinson's *in-court* identification stemmed from the incident in the station house hallway and not from observations made during the robbery and confirmed at the lineup. *See* note 16, *supra.*

*pra,* 97 S.Ct. at 2254.[22] Since, under all the circumstances, we are unwilling to find a very substantial likelihood of irreparable misidentification, the evaluation of the reliability of out-of-court identification was one for the jury to make. Similarly, we are not persuaded that the out-of-court confrontation could have so tainted the in-court identification that permitting the robbery victim to attempt an identification at trial denied appellant of due process of law. As stated by the Supreme Court:

> [W]e cannot say that under all the circumstances of this case there is "a very substantial likelihood of irreparable misidentification" . . . short of that point, such evidence is for the jury to weigh. We are content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature. [*Manson v. Brathwaite, supra,* 97 S.Ct. at 2254.]

Our conclusion that the introduction of the out-of-court and the in-court identification comported with the requirements of due process is supported by a multitude of decisions from the federal circuit courts of appeal.[23] Spontaneous pretrial · recognitions, not arranged nor solicited by the police or prosecution, have not barred, on due process grounds, a later in-court identification of the accused, *even though no untainted* identification preceded the challenged confrontation. *United States v. Colclough,* 549 F.2d 937, 940–41 (4th Cir. 1977) (spontaneous recognition following an accidental confrontation outside the courtroom; accused not in custody); *United States v. Massaro,* 544 F.2d 547, 550 (1st Cir. 1976) (spontaneous recognition following a chance meeting in a courthouse hallway; fact accused in custody not apparent); *United States v. Jewett,* 520 F.2d 581, 582 (1st Cir. 1975) (inadvertent hallway confrontation prior to preliminary hearing; identification *solicited* by the prosecutor; strong evidence of accused's guilt); *United States v. Matlock,* 491 F.2d 504, 505 (6th Cir.), cert. denied, 419 U.S. 864, 95 S.Ct. 119, 42 L.Ed.2d 100 (1974) (chance encounter when accused was *twice* escorted in handcuffs through a room in which identification witnesses were awaiting trial); *United States v. Davis,* 487 F.2d 112, 122 (5th Cir. 1973), *cert. denied,* 415 U.S. 981, 94 S.Ct. 1573, 39 L.Ed.2d 878 (1974) (witness observes defendants in custody outside the courtroom prior to trial); *Mock v. Rose,* 472 F.2d 619, 621 (6th Cir. 1972), *cert. denied,* 411 U.S. 971, 93 S.Ct. 2165, 36 L.Ed.2d 693 (1973) (complainant spontaneously identified the accused upon observing him in custody in a station house hallway; the viewing was accidental and the suspect was not exposed for purposes of identification); *United States v. Hamilton,* 469 F.2d 880, 882–83 (9th Cir. 1972) (witness spontaneously identifies accused upon observing him in handcuffs in courthouse corridor just prior to trial); *United States v. Hardy,* 448 F.2d 423, 424 (3rd Cir. 1971) (witness' chance viewing of accused sitting with a codefendant in the courtroom prior to the commencement of trial); *Griff v.*

---

**22.** *Manson v. Brathwaite, supra,* like the instant case, involved a sole eyewitness to the offense. There, the pretrial photographic identification, despite its suggestive aspect, and an in-court identification were held to be admissible in the face of a due process challenge. However, in *Manson,* the suggestive presentation of a single photograph for identification occurred *before* the witness had made *any* identification of the accused. Here, the hallway confrontation occurred *after* the victim made an untainted identification of the appellant. Here, unlike the situation in *Manson,* no identification was sought by the police. Consequently, "we found . . . little pressure on the witness to acquiesce in the suggestion that such a display entails." *Manson v. Brathwaite, supra,* 97 S.Ct. at 2254.

**23.** While these decisions follow the due process analysis outlined in the *Stovall-Simmons-Coleman-Foster* line of cases, rather than the more recent "synthesis" of these decisions announced in *Neil v. Biggers, supra,* and *Manson v. Brathwaite, supra,* 97 S.Ct. at 2249 n.9, they are in accord with the result in this case. Each case, like the case before us, involved an unplanned confrontation between the accused and a witness which resulted in a spontaneous identification.

*Fitzharris,* 451 F.2d 151, 152–53 (9th Cir. 1971) (spontaneous identification following an unarranged confrontation prior to a preliminary hearing); *United States v. Jackson,* 448 F.2d 963, 965 (9th Cir. 1971), *cert. denied,* 405 U.S. 924, 92 S.Ct. 970, 30 L.Ed.2d 796 (1972) (spontaneous identification made when witnesses sitting in spectator's section viewed accused during pretrial hearing; confrontation not arranged by the prosecution; witnesses discussed their identifications among themselves; witnesses previously unable to identify the accused from a photographic array); *United States v. Pollack,* 427 F.2d 1168, 1169 (5th Cir.), *cert. denied,* 400 U.S. 831, 91 S.Ct. 63, 27 L.Ed.2d 62 (1970) (witness recognizes accused after unexpected meeting in courthouse corridor; witness previously unable to identify accused from a single photograph shown on the day of the hallway confrontation).

Similarly, due process has not prevented the admission of an in-court identification following a witness' spontaneous identification of the accused after an accidental pretrial confrontation in cases where a valid, untainted recognition *was made,* as in the instant case, prior to the suspect encounter. *United States v. Jones,* 512 F.2d 347, 351 (9th Cir. 1975) (unplanned confrontation between witnesses and accused in a courthouse hallway prior to trial; *prior* identification made from a photographic array); *United States v. Neverson,* 150 U.S.App. D.C. 133, 135–36, 463 F.2d 1224, 1226–27 (1972) (spontaneous recognition of accused upon accidental viewing of him in handcuffs outside county jail; witness had previously identified the accused from a photographic array); *Allen v. Moore,* 453 F.2d 970, 972–74 (1st Cir.), *cert. denied,* 406 U.S. 969, 92 S.Ct. 2422, 32 L.Ed.2d 668 (1972) (spontaneous identification made following chance observation of the accused walking outside courthouse and in courthouse hallway; previous identification made from a photographic display tinged with elements of suggestivity); *United States v. Marson,* 408 F.2d 644, 648 (4th Cir.), *cert. denied,* 393 U.S. 1056, 89 S.Ct. 695, 21 L.Ed.2d 698 (1968) (witnesses sitting in spectator's section spontaneously recognize accused as he is escorted into court; witnesses comment among themselves that the assailant had been brought into the courtroom; witnesses had previously identified the accused from a photographic array); *United States v. Davis,* 407 F.2d 846, 847 (4th Cir. 1969) (victim recognized accused in corridor during the recess at trial; previous identification made at a preliminary hearing).

Moreover, the introduction of the out-of-court identification made spontaneously after an unplanned confrontation has also been found to comport with the mandates of due process. *United States v. Massaro, supra* at 550; *United States v. Neverson, supra,* 150 U.S.App.D.C. at 140, 463 F.2d at 1231; *Allen v. Moore, supra* at 974.

■■■ In short, the decisions of seven federal circuit courts of appeal collectively support the conclusion that, after an evaluation of all the circumstances, the introduction of an in-court or out-of-court identification made under conditions similar to those of the instant case will be found to comply with the mandates of due process provided (1) the confrontation is inadvertent, accidental or unplanned, (2) the identification is spontaneous and positive, (3) the police and prosecution did not intend that an identification be attempted, (4) no one pointed out the accused to the witness, and (5) the witness is cross-examined fully at trial concerning the basis of the identification.[24] A consideration of all these additional factors persuades us that no error was committed at trial when the in-court

---

**24.** Although appellant weaves the complainant's recognition of him in the courthouse cafeteria into his appeal, we are convinced his suggestion that due process was somehow implicated is without merit. This viewing was pure happenstance. The complainant's identification was completely unsolicited, unprompted, certain and spontaneous. Here, the victim's opportunity to observe the appellant was simply one that may occur at any recess during a criminal proceeding. Consequently, the cafeteria sighting was not so unnecessarily suggestive and conducive to irreparable mistaken identification that the appellant was denied due process of law. *United States v. Davis, supra* at 847.

and out-of-court identifications were admitted into evidence.

*Affirmed.*

YEAGLEY, J., concurs in the result.