Paul J. HARVEY, Appellant,

v.

UNITED STATES, Appellee.

Nos. 11213, 12693.

District of Columbia Court of Appeals.

Argued Sept. 14, 1978.

Decided Nov. 28, 1978.

Rehearing and Rehearing En Banc
Denied March 7, 1979.

the trial court's refusal to suppress lineup and subsequent in-court identifications which occurred after an allegedly suggestive confrontation; 2) his reindictment to include additional charges; 3) the fact that the grand jury which reindicted him heard only hearsay evidence through the reading of the first grand jury minutes; 4) a purportedly impermissible inference in the prosecutor's closing argument; and 5) the denial of his motion for a new trial on the basis of ineffective assistance of counsel.[1] We affirm.

Because appellant's argument primarily focuses on the allegedly suggestive pretrial confrontation, we will recount, at some length, the evidence bearing upon identification.

Thomas C. Devlin, Washington, D.C., appointed by this court, for appellant.

David S. Krakoff, Asst. U. S. Atty., Washington, D.C., with whom Earl J. Silbert, U. S. Atty., and John A. Terry, Peter E. George, Bernard J. Panetta, II, and Richard W. Goldman, Asst. U. S. Attys., Washington, D.C., were on the brief, for appellee.

Before GALLAGHER, NEBEKER and MACK, Associate Judges.

MACK, Associate Judge:

█ Following a jury trial, appellant was found guilty of second-degree burglary (D.C.Code 1973, § 22–1801(a)); armed robbery (*id.* §§ 22–2901, –3202); assault with intent to kill while armed (*id.* §§ 22–501, –3202); and malicious disfigurement (*id.* § 22–506). On appeal, he assigns as error 1)

## THE ROBBERY

At approximately 6:15 p.m. on September 30, 1975, Mrs. Mary Turner was cleaning offices on the second floor of the Department of Agriculture. She kicked open the door to a darkened room and saw the head of a man rising from behind the desk. She screamed for help and backed approximately forty feet down a hallway. Due to the energy crisis, every other light was out in the hallway. However, Mrs. Turner was directly under the light in front of the elevator when her assailant grabbed her and dragged her back into the darkened room. Mrs. Turner saw the face of her assailant from the time he dragged her from the hall back into the office.[2] The assailant then proceeded to beat her with an iron pipe and robbed her of her wallet. Finally, he made his escape through the halls and stairways of the building.

1. Where the issue presented is a post-trial claim of ineffective assistance of counsel, the test we have adopted is that of *Angarano v. United States,* D.C.App., 312 A.2d 295 (1973), *rehearing en banc denied,* 329 A.2d 453 (1974), relying on *Bruce v. United States,* 126 U.S.App. D.C. 336, 379 F.2d 113 (1967). We conclude appellant has not demonstrated "gross incompetence of counsel which has in effect blotted out the essence of a substantial defense." *See also Monroe v. United States,* D.C.App., 389 A.2d 811 (1978).

2. At the suppression hearing, on direct examination, Mrs. Turner testified that from the time she kicked open the door and the time she was pulled back into the room was approximately two or three seconds. At trial, Mrs. Turner testified that the time which passed between the time she kicked open the door and the moment when her assailant dragged her back into the room was approximately three or four minutes. The trial court held that the appellant's attorney had not impeached her on prior inconsistent statements.

A fellow worker, Mr. Reggie Patterson, chased the assailant for approximately twenty minutes. Although the assailant had his back to Mr. Patterson during the chase, he confronted Mr. Patterson twice. Mr. Patterson was approximately eight feet from the assailant when he pulled a pipe from his sleeve and told Mr. Patterson to stay away from him. Mr. Patterson maintained his distance but continued to pursue him into another wing of the building where the assailant picked up a bottle and threw it at him hitting him on the wrist. During the chase, John English, another cleaning employee, saw the assailant on the other side of a glass door and then viewed him as he pushed the door open and ran by him. Mr. English joined the chase until the assailant threatened Mr. Patterson with the pipe.

Finally, two other employees also encountered the assailant. Milton Coles, the supervisor of the cleaning crew, saw the side of assailant's face from a distance of approximately ten feet but lost sight of him when he immediately turned the corner. Janice Melvin saw the assailant as he ran past her nearly pushing her into a bucket of scrub water. She testified she saw his face for approximately five or ten seconds as he glanced at her while running.

## IDENTIFICATION

On October 5, 1975 Mr. Patterson identified a photograph of appellant after being shown over 700 slides. On December 5, 1975 Mrs. Turner sat with Mr. Patterson and Mr. English outside the lineup room of the police department waiting for the other witnesses to arrive for the lineup.[3] They were approximately fifty feet from the elevator when the door of the elevator opened and Mr. Coles emerged from the elevator. As he walked toward them they saw the appellant, who had been released on his own recognizance, step off the crowded elevator. Mrs. Turner and Mr. English immediately identified the appellant. At this point there is some conflict in the testimony. Mrs. Turner testified that she was the only one who said anything and no one else saw the appellant. She stated that she said, "Look" and Mr. Patterson said "I know who it is, I don't have to look. I can smell him a mile away." Mrs. Turner then testified that Mr. Coles asked her what she was looking at and when she told him it was her attacker, Mr. Coles turned to look but the appellant had gone into another room. However, Mr. Patterson testified that he told Mrs. Turner "There's my man" and they both tried to attract Mr. Coles' attention to him but were unsuccessful.[4] Mr. English did not hear either one say anything until Mrs. Turner told Mr. Coles that he had been on the same elevator as her attacker. It is clear however that neither Mr. Coles nor Ms. Melvin saw the appellant in this encounter in the police station hall.

The officers directing the lineup explained the procedure to be followed to each witness who then individually viewed the lineup and was kept separate from those who were yet to see it. Each of the five witnesses made a positive identification of the appellant in the lineup and also an in-court identification at the time of trial.

### I.

Appellant's contentions stem from the trial court's refusal to suppress a lineup and subsequent in-court identification which occurred after a confrontation between the witnesses and appellant in the hallway of the police station outside the lineup room. Appellant argues that this hallway confrontation irreparably tainted the witnesses' subsequent identifications and under the "totality of circumstances test" the lineup

---

3. Mr. Patterson at the suppression hearing testified on direct that prior to the arrival of Mr. Coles, he was outside the lineup room with Mrs. Turner and Mr. English. On cross-examination and at trial, Mr. Patterson testified that Ms. Melvin was also there at the time. However, Mrs. Turner, Mr. English and Mr. Coles testified that Ms. Melvin was not there and did not arrive until after Mr. Coles arrived. Ms. Melvin confirmed their testimony.

4. Mrs. Turner denied the fact that Mr. Patterson pointed to the appellant.

and in-court identifications are not reliable. *See Neil v. Biggers,* 409 U.S. 188, 199, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

In *Cureton v. United States,* D.C.App., 386 A.2d 278 (1978), this court recently considered the ramifications of a spontaneous identification, resulting from an inadvertent encounter of a handcuffed defendant in a police department elevator *following* a lineup. We held that

> [T]he introduction of an in-court or out-of-court identification made under conditions similar to those of the instant case will be found to comply with the mandates of due process provided (1) the confrontation is inadvertent, accidental, or unplanned, (2) the identification is spontaneous and positive, (3) the police and prosecution did not intend that an identification be attempted, (4) no one pointed out the accused to the witness, and (5) the witness is cross-examined fully at trial concerning the basis of the identification. [*Id.* at 288 (footnote omitted).]

■ Initially, appellant attempts to distinguish this case on the basis that the spontaneous identification occurred *prior* to the lineup and thus the lineup was influenced by the inadvertent encounter. In *Cureton,*[5] we cited decisions of six federal circuit courts of appeal[5a] collectively supporting the conclusion that a later in-court identification of the defendant subsequent to a spontaneous pretrial recognition was not barred on due process grounds even though no untainted identification preceded the challenged confrontation (as in *Cureton* ).[6] We perceive no difference in analysis as to the admissibility of an in-court identification after an allegedly suggestive encounter as in *Cureton* and the admissibility of a lineup and in-court identification after an allegedly suggestive encounter. The facts of this case demonstrate that it is precisely the situation where the standards which emerge from *Cureton* should be applied.

Furthermore, the most recent Supreme Court case in this area, *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d

5. *Cureton v. United States, supra* at 287.

5a. *United States v. Colclough,* 549 F.2d 937, 940–41 (4th Cir. 1977) (spontaneous recognition following an accidental confrontation outside the courtroom; accused not in custody); *United States v. Massaro,* 544 F.2d 547, 550 (1st Cir. 1976), [*cert. denied,* 429 U.S. 1052, 97 S.Ct. 766, 50 L.Ed.2d 769 (1977)] (spontaneous recognition following a chance meeting in a courtroom hallway; fact accused in custody not apparent); *United States v. Jewett,* 520 F.2d 581, 582 (1st Cir. 1975) (inadvertent hallway confrontation prior to preliminary hearing; identification solicited by the prosecutor; strong evidence of accused's guilt); *United States v. Matlock,* 491 F.2d 504, 505 (6th Cir.), *cert. denied,* 419 U.S. 864, 95 S.Ct. 119, 42 L.Ed.2d 100 (1974) (chance encounter when accused was twice escorted in handcuffs through a room in which identification witnesses were awaiting trial); *United States v. Davis,* 487 F.2d 112, 122 (5th Cir. 1973), *cert. denied,* 415 U.S. 981, 94 S.Ct. 1573, 39 L.Ed.2d 878 (1974) (witness observes defendants in custody outside the courtroom prior to trial); *Mock v. Rose,* 472 F.2d 619 (6th Cir. 1972), *cert. denied,* 411 U.S. 971, 93 S.Ct. 2165, 36 L.Ed.2d 693 (complainant spontaneously identified the accused upon observing him in custody in a station house hallway; the viewing was accidental and the suspect was not exposed for purposes of identification); *United States v. Hamilton,*

469 F.2d 880, 882–83 (9th Cir. 1972) (witness spontaneously identifies accused upon observing him in handcuffs in courthouse corridor just prior to trial); *United States v. Hardy,* 448 F.2d 423, 424 (3rd Cir. 1971) (witness' chance viewing of accused sitting with a codefendant in the courtroom prior to the commencement of trial); *Griff v. Fitzharris,* 451 F.2d 151, 152–53 (9th Cir. 1971) (spontaneous identification following an unarranged confrontation prior to preliminary hearing; *United States v. Jackson,* 448 F.2d 963, 965 (9th Cir. 1971), *cert. denied,* 405 U.S. 924, 92 S.Ct. 970, 30 L.Ed.2d 796 (1972) (spontaneous identification made when witnesses sitting in spectator's section viewed accused during pretrial hearing; confrontation not arranged by the prosecution; witnesses discussed their identifications among themselves; witnesses previously unable to identify the accused from a photographic array); *United States v. Pollack,* 427 F.2d 1168, 1169 (5th Cir.), *cert. denied,* 400 U.S. 831, 91 S.Ct. 63, 27 L.Ed.2d 62 (1970) (witness recognizes accused after unexpected meeting in courthouse corridor; witness previously unable to identify accused from a single photograph shown on the day of the hallway confrontation).

6. However, one of the witnesses, Mr. Patterson, did identify a photograph of appellant prior to the encounter in the hallway.

140 (1977), involved the suggestive presentation of a single photograph for identification to an undercover police officer *prior* to the in-court identification. The Supreme Court held that the pretrial photographic identification was admissible in the face of a due process challenge if "under the totality of the circumstances" the identification was reliable. *Id.* at 113–14, 97 S.Ct. at 2252. The standards articulated in the *Cureton* decision were based on the reliability analysis[7] involved in *Manson v. Brathwaite, supra.* Therefore, if the *Cureton* standards are satisfied, the introduction of this evidence comported with the requirements of due process.

■ Application of the five factor analysis to the facts of this case persuades us that due process was not offended by the admission at trial of the testimony involving the lineup identification and the witnesses' subsequent in-court identification.

■ There is no dispute in the record that the hallway confrontation was not planned but was accidental and inadvertent. Mrs. Turner, Mr. Patterson and Mr. English testified that they spontaneously and positively recognized appellant immediately after he descended from a crowded elevator. Unlike the situation in *United States v. Matlock*, 491 F.2d 504 (6th Cir.), *cert. denied*, 419 U.S. 864, 95 S.Ct. 119, 42 L.Ed.2d 100 (1974); *Mock v. Rose*, 472 F.2d 619 (6th

Cir. 1972), *cert. denied*, 411 U.S. 971, 93 S.Ct. 2165, 36 L.Ed.2d 693 (1973) and *United States v. Hamilton*, 469 F.2d 880 (9th Cir. 1972), there was nothing about the defendant's appearance or condition at the time of the out-of-court identification, such as being in prison garb or handcuffed, to suggest that he was a defendant in a criminal prosecution.[8] The elevator was open to the public and the appellant had been released on his own recognizance. The identification by the witnesses of the appellant departing from a crowded elevator stemmed from the witnesses' spontaneous recognition of the appellant based on their observations at the time of the robbery. The appellant never contended that the government intended the confrontation in the hallway to occur. Not one of the witnesses testified that appellant was pointed out by anyone to him or her as a defendant in the robbery case or even connected with the case in any way.[9] Finally, appellant's counsel cross-examined each witness fully at the suppression hearing and trial concerning the basis of the identification.[9a]

## II.

■ The appellant's second contention is that the second indictment should be dismissed because of the prosecutor's misuse of the plea bargaining procedure. In an indictment filed January 7, 1976, the appel-

---

**7.** *Cureton v. United States, supra* at 285 states:

The factors to be considered in an evaluation of the reliability of an admittedly suggestive identification were set out in *Neil v. Biggers, supra*, 409 U.S. at 199–200, 93 S.Ct. 375, and cited with approval in *Manson v. Brathwaite, supra* at 97 S.Ct. 2253. These include (1) the opportunity of the witness to view the criminal during the crime, (2) the witness' degree of attention, (3) the accuracy of his prior description of the criminal, (4) the level of certainty demonstrated at the confrontation, and (5) the time between the crime and the confrontation.

**8.** In the three cases cited these factors were not found to be so unduly suggestive as to render inadmissible the identification testimony of the witness.

**9.** On appeal, we must view the evidence in the light most favorable to the prevailing party below. *Crawley v. United States*, D.C.App.,

320 A.2d 309, 312 (1974); *Saunders v. United States*, D.C.App., 317 A.2d 867, 868 (1974). Even accepting appellant's version of the facts in that Mr. Patterson pointed out the appellant to Mrs. Turner and Mr. English was looking in Mr. Patterson's direction at the time, the Sixth Circuit under similar facts allowed the identification testimony. *United States v. Matlock, supra.* The court based its decision on the independent origin of the identification of the defendant which made the inadvertent encounter non-prejudicial to the defendant. *Id.* at 506. Both Mrs. Turner and Mr. English based their identification of the appellant on a clear recollection of the appellant's appearance at the time of the robbery and a sufficient opportunity at that time to acquire facts to make an identification. *Accord, Griff v. Fitzharris*, 451 F.2d 151, 152 (9th Cir. 1971).

**9a.** We have examined a photograph of the lineup and find no suggestivity in its makeup.

lant was charged with second-degree burglary (D.C.Code 1973, § 22–1801(a)); robbery (*id.* § 22–2901); armed robbery (*id.* §§ 22–2901, –3202); and assault with a dangerous weapon (*id.* § 22–502). On March 31, 1976, after an evidentiary hearing, appellant's motion to suppress identification was denied. At the suppression hearing the prosecutor on the record informed the appellant that if he entered a plea of guilty to the indictment the government would not seek reindictment on the additional counts of assault with intent to kill and mayhem and would not file an information advising the court that the appellant, if convicted, was subject to life imprisonment as the result of two prior felony convictions.[10] D.C.Code 1973, § 22–104a. The appellant rejected the government's offer and was subsequently reindicted by a grand jury which considered only the minutes of the first grand jury proceeding.[11] A superseding indictment filed April 21, 1976 additionally charged appellant with assault with intent to kill (D.C.Code 1973, § 22–501); assault with intent to kill while armed (*id.* §§ 22–501, –3202); and malicious disfigurement (*id.* § 22–506). The government filed two informations advising the court that the appellant was subject to life imprisonment if convicted of this offense, as a result of having been previously convicted of two felonies, and to an increased penalty for being on pretrial release in an unrelated case at the time of commission of the instant offense (D.C.Code 1973, § 23–1328). The jury found appellant guilty of second-degree burglary, armed robbery, assault with intent to kill while armed and malicious disfigurement, the last two being the result of the superseding indictment. Appellant was sentenced to concurrent terms of incarceration of five to fifteen years on the burglary and assault with intent to kill while armed charges, fifteen years to life imprisonment on the armed robbery charge and three to nine years for malicious disfigurement.

In *Bordenkircher v. Hayes,* 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978) a state prisoner was indicted for uttering a forged check, the penalty being a maximum ten year sentence. The prosecutor advised the defendant that if he pleaded guilty to the charge, he would not seek reindictment under the state criminal recidivist statute which would subject the defendant to a life sentence. The Supreme Court held that the due process clause was not violated when a state prosecutor carries out a threat made during plea negotiations to have the defendant reindicted on more serious charges, on which he is plainly subject to prosecution, if he does not plead guilty to the offenses with which he was originally

---

10. The suppression hearing transcript states:

THE PROSECUTOR: I would just merely make one suggestion at this time, and that is that Mr. Harvey at the moment stands charged in a four-count indictment with second degree burglary, armed robbery, robbery, and assault with a dangerous weapon. I would inform counsel, on the record, that if Mr. Harvey enters a plea of guilty to the indictment at the next status hearing on April 7, 1976, the Government will not seek reindictment adding the additional counts of assault with intent to kill and mayhem and will not file life papers. However, the Government will not waive allocution under any circumstances.

If the defendant does not enter his plea on April 7, 1976, then the Government will seek a reindictment of assault with intent to kill and mayhem, file life papers and there will be no plea accepted except for the entire indictment.

11. The third contention of the appellant is that the second indictment should be dismissed because it was based exclusively on a transcript of sworn testimony before the first grand jury. The manner of submitting this testimony has been sanctioned in our decision in *United States v. Wagoner,* D.C.App., 313 A.2d 719, *cert. denied,* 419 U.S. 1052, 95 S.Ct. 630, 42 L.Ed.2d 647 (1974). *See also Costello v. United States,* 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956). However, purely as a matter of policy, we hope that the government would continue the traditional method of evidence through live witnesses. *See United States v. Wagoner,* D.C. App., 321 A.2d 211 (1974) (Gallagher, J., dissenting from denial of rehearing en banc). This would decrease the risk of dismissal for the improper use of hearsay. *See United States v. Estepa,* 471 F.2d 1132, 1137 (2d Cir. 1972) (dismissal required where there is deception of the grand jury or a high probability that the grand jury would not have indicted if presented with first-hand testimony).

charged. *Id.* at 364–65, 98 S.Ct. 663. Although *Bordenkircher* disposes of appellant's claim, we emphasize the fact that there are constitutional limits imposed on the exercise of discretion by the prosecutor in what charges to file or bring before a grand jury. *Id.* As Judge McCree in writing for a unanimous panel of the Sixth Circuit noted "the prosecutor initially 'makes a discretionary determination that the interests of the state are served by not seeking more serious charges'." [12] This is not to state that one may not be reindicted, or that a new information may not be filed before trial. However, we believe the better practice is to bring all the charges in the original indictment unless there are compelling reasons for bringing the new or additional charges, e. g., newly discovered evidence. [13] Cf. *Wynn v. United States*, D.C. App., 386 A.2d 695, 697–98 (1978).

### III.

▮ Appellant's final contention is that the government's closing argument to the jury concerning the whereabouts of a volunteer assignment book was improper and prejudicial. During cross-examination by the prosecutor an alibi witness, Rev. Marie Carter, was asked about a sign-in book for volunteers at appellant's place of employment and why she did not bring it to court after being requested by the prosecution. After the prosecution's second request, Rev. Carter agreed to bring the book back for the afternoon session but was unable to find it. At the close of the evidence the prosecutor asked for a missing records jury instruction. The government intended to argue that the failure of the defense to produce the book allowed an inference that the book would disclose that the appellant had not signed in on the date of the robbery. The trial judge refused to give this instruction and stated that the book was

not peculiarly available to the defense. After completion of the trial, the government and defense made closing arguments. Towards the end of the prosecutor's closing argument, the prosecution urged:

PROSECUTOR: Ladies and gentlemen, I have a few documents in this case,—Rev. Carter's calendar, the sheet that Mr. Harvey supposedly gave to Mr. Bailey, the transportation log. Does it appear anywhere on any of those sheets of paper that Mr. Harvey was there on September 30, 1975? Look for yourselves. I submit to you that it doesn't. There was some mention of a volunteer assignment book and whether Mr. Harvey's name appears in that, we don't know. That book couldn't be found.

In *Givens v. United States,* D.C.App., 385 A.2d 24 (1978) we held that the procedure of obtaining an advance ruling from the court on a missing witness inference must be followed or it is reversible error to argue to the jury that it can draw an adverse inference from the defendant's failure to produce a witness. *See Gass v. United States,* 135 U.S.App.D.C. 11, 19, 416 F.2d 767, 775 (1969). However, this case is distinguishable from *Givens, supra.* Here the prosecutor stated that "the book couldn't be found" but did not go the additional step as in *Givens* to suggest that the absence of the book [witness] implied guilt on the part of the defendant. We find that the prosecution complied with the *Gass* rule and did not commit reversible error.

*Affirmed.*

NEBEKER, Associate Judge:

I concur in the result but not in the dicta and personal views of my colleagues respecting the footnoted "hope" based on "a matter of policy", that the government should continue the "traditional method" of presenting "live witnesses" to the grand

---

12. This was cited in Justice Blackmun's dissenting opinion in *Bordenkircher* as support for his position that the prosecutor ought to be able to justify the increase in charges on some basis other than discouraging a defendant from the exercise of his right to a trial. 434 U.S. at 367, 98 S.Ct. 663 at 670.

13. This practice keeps the indictment procedure visible to the public so that it can judge whether the policy being followed is a fair one. *Bordenkircher v. Hayes, supra* at 368–69, 98 S.Ct. 663 n.2 (Blackmun, J., dissenting).

jury, *supra* note 11, and that the government initially must present and, presumably, the grand jury must indict on all charges.

I find it unnecessary and of doubtful value to suggest, contrary to established precedent, that witnesses must retestify in the event of a superseding indictment. A major interest my colleagues ignore is that of witnesses to or victims of crime who make all too many trips to the courthouse anyway. I see no value in suggesting that that burden on them be increased by reappearance before the grand jury. Given the informal basis upon which an indictment can be based,* there is no reason in "policy" to require witnesses with firsthand knowledge to reappear before a grand jury in order to have a valid superseding indictment.

The policy of victim and witness accommodation as well as that of efficiency also augur against a requirement that all known charges be included in the first charging document. *Bordenkircher v. Hayes,* 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978), implicitly recognized the danger and impracticality of initially bringing all available charges when it speaks of "the very premises that underlie the concept of plea bargaining itself" and the evil of such practice since it "could only invite unhealthy subterfuge that would drive the practice of plea bargaining back into the shadows from which it has so recently emerged." *Id.* at 365, 98 S.Ct. at 669. Since this case "would be no different if the grand jury had indicted [appellant for all other charges] from the outset, and the prosecutor had offered to drop [some charges] as part of the plea bargain", *id.* at 361, 98 S.Ct. at 666, there is no useful purpose in the suggestion of the majority and no validity to the assertion that the "better practice" is to include all known charges in the first charging document.

---

* *See, e. g., United States v. Calandra,* 414 U.S. 338, 344–45, 94 S.Ct. 613, 618, 38 L.Ed.2d 561 (1974) ("the validity of an indictment is not affected by the character of the evidence considered"); *United States v. Dionisio,* 410 U.S. 1, 15, 93 S.Ct. 764, 772, 35 L.Ed.2d 67 (1973) (grand jurors "may act on tips, rumors, evidence offered by the prosecutor, or their own personal knowledge"). *See also United States v. Washington,* D.C.App., 328 A.2d 98 (1974), *reversed in part on other grounds, United States v. Washington,* 431 U.S. 181, 97 S.Ct. 1814, 52 L.Ed.2d 238 (1977).